# NATIONAL LABOR RELATIONS BOARD *v.* RETAIL STORE EMPLOYEES UNION, LOCAL 1001, RETAIL CLERKS INTERNATIONAL ASSN., AFL–CIO, ET AL.

No. 79–672.   Argued April 15, 1980—Decided June 20, 1980

Powell, J., announced the Court's judgment and delivered an opinion of the Court with respect to Parts I and II, in which Burger, C. J., and Stewart, Blackmun, Rehnquist, and Stevens, JJ., joined, and an opinion with respect to Part III, in which Burger, C. J., and Stewart and Rehnquist, JJ., joined. Blackmun, J., *post*, p. 616, and Stevens, J., *post*, p. 618, filed opinions concurring in part and in the result. Brennan, J., filed a dissenting opinion, in which White and Marshall, JJ., joined, *post*, p. 619.

*Norton J. Come* argued the cause for petitioner. With him on the briefs were *Solicitor General McCree* and *Linda Sher. Bruce Michael Cross* filed a brief for the Safeco Title Insurance Co., respondent under this Court's Rule 21 (4), in support of petitioner.

*Laurence Gold* argued the cause for respondent Retail Store Employees Union. With him on the brief were *James H. Webster, J. Albert Woll,* and *George Kaufmann.**

———

**Andrew M. Kramer, Adin C. Goldberg,* and *Stephen A. Bokat* filed a

MR. JUSTICE POWELL delivered the opinion of the Court.†

The question is whether § 8 (b)(4)(ii)(B) of the National Labor Relations Act, 29 U. S. C. § 158 (b)(4)(ii)(B), forbids secondary picketing against a struck product when such picketing predictably encourages consumers to boycott a neutral party's business.

## I

Safeco Title Insurance Co. underwrites real estate title insurance in the State of Washington. It maintains close business relationships with five local title companies.[1] The companies search land titles, perform escrow services, and sell title insurance. Over 90% of their gross incomes derives from the sale of Safeco insurance. Safeco has substantial stockholdings in each title company, and at least one Safeco officer serves on each company's board of directors. Safeco, however, has no control over the companies' daily operations. It does not direct their personnel policies, and it never exchanges employees with them.

Local 1001 of the Retail Store Employees Union became the certified bargaining representative for certain Safeco employees in 1974. When contract negotiations between Safeco and the Union reached an impasse, the employees went on strike. The Union did not confine picketing to Safeco's office in Seattle. The Union also picketed each of the five local title companies. The pickets carried signs

---

brief for the Chamber of Commerce of the United States of America as *amicus curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed by *Jack Greenberg* and *Eric Schnapper* for the NAACP Legal Defense and Educational Fund, Inc.; and by *David C. Vladeck* and *Alan B. Morrison* for Public Citizen et al.

†Part III of the opinion is joined only by THE CHIEF JUSTICE, MR. JUSTICE STEWART, and MR. JUSTICE REHNQUIST.

[1] The title companies are Land Title Co. of Clark County, Land Title Co. of Cowlitz County, Land Title Co. of Kitsap County, Land Title Co. of Pierce County, and Land Title Co. of Snohomish County.

declaring that Safeco had no contract with the Union,[2] and they distributed handbills asking consumers to support the strike by canceling their Safeco policies.[3]

Safeco and one of the title companies filed complaints with the National Labor Relations Board. They charged that the Union had engaged in an unfair labor practice by picketing in order to promote a secondary boycott against the title companies. The Board agreed. 226 N. L. R. B. 754 (1976).[4] It found the title companies to be neutral in the dispute between Safeco and the Union. *Id.*, at 756. The Board then concluded that the Union's picketing violated § 8 (b)(4)(ii) (B) of the National Labor Relations Act. The Union had directed its appeal against Safeco insurance policies. But since the sale of those policies accounted for substantially all of the title companies' business, the Board found that the Union's action was "reasonably calculated to induce customers not to patronize the neutral parties at all." 226 N. L. R. B., at 757. The Board therefore rejected the Union's reliance upon *NLRB* v. *Fruit Packers,* 377 U. S. 58 (1964) (*Tree Fruits*), which held that § 8 (b)(4)(ii)(B) allows secondary picketing against a struck product. It ordered the Union to cease picketing and to take limited corrective action.

---

[2] The picket signs read:

"SAFECO NONUNION
DOES NOT EMPLOY MEMBERS OF
OR HAVE CONTRACT WITH
RETAIL STORE EMPLOYEES LOCAL 1001."

[3] The distribution of handbills has not been an issue in this case. Section 8 (b)(4) of the National Labor Relations Act does not prohibit "publicity, other than picketing, for the purpose of truthfully advising the public . . . that a product or products are produced by an employer with whom the labor organization has a primary dispute and are distributed by another employer. . . ." 61 Stat. 141, as amended, 73 Stat. 543, 29 U. S. C. § 158 (b)(4).

[4] The parties waived intermediate proceedings before an administrative law judge and submitted the stipulated facts directly to the Board. 226 N. L. R. B., at 754.

The United States Court of Appeals for the District of Columbia Circuit set aside the Board's order. 194 U. S. App. D. C. 400, 600 F. 2d 280 (1979) (en banc). The court agreed that the title companies were neutral parties entitled to the benefit of § 8 (b)(4)(ii)(B). 201 U. S. App. D. C. 147, 151, 627 F. 2d 1133, 1137 (1979). It held, however, that *Tree Fruits* leaves neutrals susceptible to whatever consequences may flow from secondary picketing against the consumption of products produced by an employer involved in a labor dispute. Even when product picketing predictably encourages consumers to boycott a neutral altogether, the court concluded, § 8 (b)(4)(ii)(B) provides no protection. 201 U. S. App. D. C., at 159–160, 627 F. 2d, at 1145–1146.

We granted a writ of certiorari to consider whether the Court of Appeals correctly understood § 8 (b)(4)(ii)(B) as interpreted in *Tree Fruits.* 444 U. S. 1011 (1980).[5] Having concluded that the Court of Appeals misapplied the statute, we now reverse and remand for enforcement of the Board's order.

## II

Section 8 (b)(4)(ii)(B) of the National Labor Relations Act makes it "an unfair labor practice for a labor organization . . . to threaten, coerce, or restrain" a person not party to a labor dispute "where . . . an object thereof is . . . forcing or requiring [him] to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer . . . or to cease doing business with any other person. . . ."[6]

In *Tree Fruits*, the Court held that § 8 (b)(4)(ii)(B) does not prohibit all peaceful picketing at secondary sites. There, a union striking certain Washington fruit packers picketed large supermarkets in order to persuade consumers not to buy

---

[5] The Union has not challenged the Court of Appeals' determination that the title companies are neutral, secondary parties.

[6] 61 Stat. 141, as amended, 73 Stat. 542, 29 U. S. C. § 158 (b)(4)(ii)(B).

Washington apples. Concerned that a broad ban against such picketing might run afoul of the First Amendment, the Court found the statute directed to an " 'isolated evil.' " The evil was use of secondary picketing "to persuade the customers of the secondary employer to cease trading with him in order to force him to cease dealing with, or to put pressure upon, the primary employer." 377 U. S., at 63. Congress intended to protect secondary parties from pressures that might embroil them in the labor disputes of others, but not to shield them from business losses caused by a campaign that successfully persuades consumers "to boycott the primary employer's goods." *Ibid.* Thus, the Court drew a distinction between picketing "to shut off all trade with the secondary employer unless he aids the union in its dispute with the primary employer" and picketing that "only persuades his customers not to buy the struck product." *Id.,* at 70. The picketing in that case, which "merely follow[ed] the struck product," did not " 'threaten, coerce, or restrain' " the secondary party within the meaning of § 8 (b)(4)(ii)(B). 377 U. S., at 72.

Although *Tree Fruits* suggested that secondary picketing against a struck product and secondary picketing against a neutral party were "poles apart," *id.,* at 70, the courts soon discovered that product picketing could have the same effect as an illegal secondary boycott. In *Hoffman ex rel. NLRB* v. *Cement Masons Local 337,* 468 F. 2d 1187 (CA9 1972), cert. denied, 411 U. S. 986 (1973), for example, a union embroiled with a general contractor picketed the housing subdivision that he had constructed for a real estate developer. Pickets sought to persuade prospective purchasers not to buy the contractor's houses. The picketing was held illegal because purchasers "could reasonably expect that they were being asked not to transact any business whatsoever" with the neutral developer. 468 F. 2d, at 1192. "[W]hen a union's interest in picketing a primary employer at a 'one product' site [di-

rectly conflicts] with the need to protect . . . neutral employers from the labor disputes of others," Congress has determined that the neutrals' interests should prevail. *Id.*, at 1191.[7]

*Cement Masons* highlights the critical difference between the picketing in this case and the picketing at issue in *Tree Fruits.* The product picketed in *Tree Fruits* was but one item among the many that made up the retailer's trade. 377 U. S., at 60. If the appeal against such a product succeeds, the Court observed, it simply induces the neutral retailer to reduce his orders for the product or "to drop the item as a poor seller." *Id.*, at 73. The decline in sales attributable to consumer rejection of the struck product puts pressure upon the primary employer, and the marginal injury to the neutral retailer is purely incidental to the product boycott. The neutral therefore has little reason to become involved in the labor dispute. In this case, on the other hand, the title companies sell only the primary employer's product and perform the services associated with it. Secondary picketing against consumption of the primary product leaves responsive consumers no realistic option other than to boycott the title companies altogether. If the appeal succeeds, each company "stops buying the struck product, not because of a falling demand, but in response to pressure designed to inflict injury on [its] business generally." Thus, "the union does more than merely follow the struck product; it creates a separate dispute with the secondary employer." *Id.*, at 72. Such an expansion of

---

[7] The so-called merged product cases also involve situations where an attempt to follow the struck product inevitably encourages an illegal boycott of the neutral party. See *K & K Construction Co.* v. *NLRB*, 592 F. 2d 1228, 1231–1234 (CA3 1979); *American Bread Co.* v. *NLRB*, 411 F. 2d 147, 154–155 (CA6 1969); *Honolulu Typographical Union No. 37* v. *NLRB*, 131 U. S. App. D. C. 1, 3–4, 401 F. 2d 952, 954–955 (1968); Note, Consumer Picketing and the Single-Product Secondary Employer, 47 U. Chi. L. Rev. 112, 132–136 (1979).

labor discord was one of the evils that Congress intended § 8 (b)(4)(ii)(B) to prevent. 377 U. S., at 63–64.

As long as secondary picketing only discourages consumption of a struck product, incidental injury to the neutral is a natural consequence of an effective primary boycott. See *id.,* at 72–73. But the Union's secondary appeal against the central product sold by the title companies in this case is "reasonably calculated to induce customers not to patronize the neutral parties at all." 226 N. L. R. B., at 757.[8] The resulting injury to their businesses is distinctly different from the injury that the Court considered in *Tree Fruits.*[9] Product picketing that reasonably can be expected to threaten neutral parties with ruin or substantial loss simply does not square

---

[8] See *Local 14055, United Steelworkers (Dow Chemical Co.),* 211 N. L. R. B. 649, 651–652 (1974), enf. denied, 173 U. S. App. D. C. 299, 524 F. 2d 853 (1975), vacated and remanded, 429 U. S. 807 (1976), complaint dism'd, 229 N. L. R. B. 302 (1977).

We do not disagree with MR. JUSTICE BRENNAN's dissenting view that successful secondary product picketing may have no greater effect upon a neutral than a legal primary boycott. *Post,* at 623. But when the neutral's business depends upon the products of a particular primary employer, secondary product picketing can produce injury almost identical to the harm resulting from an illegal secondary boycott. See generally Duerr, Developing a Standard for Secondary Consumer Picketing, 26 Lab. L. J. 585 (1975). Congress intended § 8 (b)(4)(ii)(B) to protect neutrals from that type of coercion. MR. JUSTICE BRENNAN's view that the legality of secondary picketing should depend upon whether the pickets "urge only a boycott of the primary employer's product," *post,* at 622, would provide little or no protection. No well-advised union would allow secondary pickets to carry placards urging anything other than a product boycott. Section 8 (b)(4)(ii)(B) cannot bear a construction so inconsistent with the congressional intention to prevent neutrals from becoming innocent victims in contests between others.

[9] The Union is responsible for the "foreseeable consequences" of its conduct. *NLRB* v. *Operating Engineers,* 400 U. S. 297, 304–305 (1971); see *Radio Officers* v. *NLRB,* 347 U. S. 17, 45 (1954). See also *NLRB* v. *Denver Building Council,* 341 U. S. 675, 689 (1951).

with the language or the purpose of § 8 (b)(4)(ii)(B).[10] Since successful secondary picketing would put the title companies to a choice between their survival and the severance of their ties with Safeco, the picketing plainly violates the statutory ban on the coercion of neutrals with the object of "forcing or requiring [them] to cease . . . dealing in the [primary] produc[t] . . . or to cease doing business with" the primary employer. § 8 (b)(4)(ii)(B); see *Tree Fruits*, 377 U. S., at 68.[11]

---

[10] Representative Griffin, a sponsor of the Landrum-Griffin amendments that brought § 8 (b)(4)(ii)(B) into law, emphasized to the Congress that the statute would outlaw secondary picketing likely to coerce the neutral party. "If the purpose of the picketing," he said, "is to coerce or to restrain the employer of that second establishment, to get him not to do business with the manufacturer—then such a boycott could be stopped." 105 Cong. Rec. 15673 (1959), reprinted in 2 National Labor Relations Board, Legislative History of the Labor-Management Reporting and Disclosure Act of 1959, p. 1615 (1959).

Senator McClellan, who offered a bill quite similar to the statute actually adopted, noted that secondary picketing is particularly likely to coerce neutrals who have based their businesses upon one manufacturer's products. He pointed out:

"[W]e have cases of merchants who for 20 years, 10 years, or for a long period of time, may have been handling a particular brand of product. A merchant may have built his business around the product, such as the John Deere plows or some kind of machinery from some other company. The merchant may have built up his trade entirely on that product." 105 Cong. Rec. 6667 (1959), reprinted in 2 Legislative History, *supra*, at 1194.

[11] The picketing in *Tree Fruits* and the picketing in this case are relatively extreme examples of the spectrum of conduct that the Board and the courts will encounter in complaints charging violations of § 8.(b)(4)(ii) (B). If secondary picketing were directed against a product representing a major portion of a neutral's business, but significantly less than that represented by a single dominant product, neither *Tree Fruits* nor today's decision necessarily would control. The critical question would be whether, by encouraging customers to reject the struck product, the secondary appeal is reasonably likely to threaten the neutral party with ruin

## III

The Court of Appeals suggested that application of § 8 (b) (4)(ii)(B) to the picketing in this case might violate the First Amendment. 201 U. S. App. D. C., at 161, 627 F. 2d, at 1147. We think not. Although the Court recognized in *Tree Fruits* that the Constitution might not permit "a broad ban against peaceful picketing," the Court left no doubt that Congress may prohibit secondary picketing calculated "to persuade the customers of the secondary employer to cease trading with him in order to force him to cease dealing with, or to put pressure upon, the primary employer." 377 U. S., at 63. Such picketing spreads labor discord by coercing a neutral party to join the fray. In *Electrical Workers* v. *NLRB*, 341 U. S. 694, 705 (1951), this Court expressly held that a prohibition on "picketing in furtherance of [such] unlawful objectives" did not offend the First Amendment. See *American Radio Assn.* v. *Mobile S.S. Assn.*, 419 U. S. 215, 229–231 (1974); *Teamsters* v. *Vogt, Inc.*, 354 U. S. 284 (1957). We perceive no reason to depart from that well-established understanding. As applied to picketing that predictably encourages consumers to boycott a secondary business, § 8 (b) (4)(ii)(B) imposes no impermissible restrictions upon constitutionally protected speech.

Accordingly, the judgment of the Court of Appeals is reversed, and the case is remanded with directions to enforce the National Labor Relations Board's order.

*So ordered.*

MR. JUSTICE BLACKMUN, concurring in part and concurring in the result.

I join Parts I and II of the Court's opinion, but not Part III. The plurality's cursory discussion of what for me are difficult First Amendment issues presented by this case fails to

or substantial loss. Resolution of the question in each case will be entrusted to the Board's expertise.

take account of the effect of this Court's decision in *Police Department of Chicago* v. *Mosley,* 408 U. S. 92 (1972), on the question whether the National Labor Relations Act's content-based ban on peaceful picketing of secondary employers is constitutional. The failure to take *Mosley* into account is particularly ironic given that the Court today reaffirms and extends the principles of that case in *Carey* v. *Brown, ante,* p. 455.

In *NLRB* v. *Fruit Packers,* 377 U. S. 58, 76 (1964), Mr. Justice Black wrote a concurring opinion in which he concluded that § 8 (b)(4)(ii)(B) of the National Labor Relations Act "abridges freedom of speech and press in violation of the First Amendment." He said:

> "In short, we have neither a case in which picketing is banned because the picketers are asking others to do something unlawful nor a case in which *all* picketing is, for reasons of public order, banned. Instead, we have a case in which picketing, otherwise lawful, is banned only when the picketers express particular views. The result is an abridgement of the freedom of these picketers to tell a part of the public their side of a labor controversy, a subject the free discussion of which is protected by the First Amendment." 377 U. S., at 79. (Emphasis in original.)

These views, central to Mr. Justice Black's vision of the First Amendment, were, one would have supposed until today, "accepted" by the Court in *Mosley.* See 408 U. S., at 98.

I have never been fully comfortable with *Mosley*'s equating all content selectivity in affording access to picketers with censorship. See *Mosley,* 408 U. S., at 102 (concurring statement). For this reason, I join today in Mr. Justice Rehnquist's dissenting opinion in *Carey* v. *Brown.* I concur in the result in this case, however, only because I am reluctant to hold unconstitutional Congress' striking of the delicate balance between union freedom of expression and the ability

of neutral employers, employees, and consumers to remain free from coerced participation in industrial strife. My vote should not be read as foreclosing an opposite conclusion where another statutory ban on peaceful picketing, unsupported by equally substantial governmental interests, is at issue.

MR. JUSTICE STEVENS, concurring in part and concurring in the result.

For the reasons stated by Mr. Justice Harlan and Mr. Justice Black in their separate opinions in *NLRB* v. *Fruit Packers,* 377 U. S. 58, 76, 80 (*Tree Fruits*), I am persuaded that Congress intended to prohibit this secondary picketing, and for the reasons stated by MR. JUSTICE POWELL, I agree that this case is not governed by *Tree Fruits.* I therefore join Parts I and II of the Court's opinion.

The constitutional issue, however, is not quite as easy as the plurality would make it seem because, as Mr. Justice Black pointed out in *Tree Fruits,* "we have a case in which picketing, otherwise lawful, is banned only when the picketers express particular views." *Id.,* at 79. In other words, this is another situation in which regulation of the means of expression is predicated squarely on its content. See *Consolidated Edison Co.* v. *Public Service Comm'n, ante,* at 546 (STEVENS, J., concurring in judgment). I agree with the plurality that this content-based restriction is permissible but not simply because it is in furtherance of objectives deemed unlawful by Congress. *Ante,* at 616. That a statute proscribes the otherwise lawful expression of views in a particular manner and at a particular location cannot in itself totally justify the restriction. Otherwise the First Amendment would place no limit on Congress' power. In my judgment, it is our responsibility to determine whether the method or manner of expression, considered in context, justifies the particular restriction.

I have little difficulty in concluding that the restriction at issue in this case is constitutional. Like so many other kinds

of expression, picketing is a mixture of conduct and communication. In the labor context, it is the conduct element rather than the particular idea being expressed that often provides the most persuasive deterrent to third persons about to enter a business establishment. In his concurring opinion in *Bakery Drivers* v. *Wohl*, 315 U. S. 769, 776–777, Mr. Justice Douglas stated:

> "Picketing by an organized group is more than free speech, since it involves patrol of a particular locality and since the very presence of a picket line may induce action of one kind or another, quite irrespective of the nature of the ideas which are being disseminated. Hence those aspects of picketing make it the subject of restrictive regulation."*

Indeed, no doubt the principal reason why handbills containing the same message are so much less effective than labor picketing is that the former depend entirely on the persuasive force of the idea.

The statutory ban in this case affects only that aspect of the union's efforts to communicate its views that calls for an automatic response to a signal, rather than a reasoned response to an idea. And the restriction on picketing is limited in geographical scope to sites of neutrals in the labor dispute. Because I believe that such restrictions on conduct are sufficiently justified by the purpose to avoid embroiling neutrals in a third party's labor dispute, I agree that the statute is consistent with the First Amendment.

MR. JUSTICE BRENNAN, with whom MR. JUSTICE WHITE and MR. JUSTICE MARSHALL join, dissenting.

*NLRB* v. *Fruit Packers*, 377 U. S. 58 (1964) (*Tree Fruits*), held that it was permissible under § 8 (b)(4)(ii)(B) of the

---

*See also *Teamsters* v. *Vogt, Inc.*, 354 U. S. 284, 289; *Hughes* v. *Superior Court,* 339 U. S. 460, 465–466, 468.

National Labor Relations Act (NLRA) [1] for a union involved in a labor dispute with a primary employer to conduct peaceful picketing at a secondary site with the object of persuading consumers to boycott the primary employer's product. Today's decision stunts *Tree Fruits* by declaring that secondary site picketing is illegal when the primary employer's product at which it is aimed happens to be the only product which the secondary retailer distributes. I dissent.

The NLRA does not place the secondary site off limits to all consumer picketing over the dispute with the primary employer. *Tree Fruits, supra,* at 63. The Act only prohibits a labor union from picketing to "coerce" a secondary firm into joining the union's struggle against the primary employer. § 8 (b)(4)(ii)(B). But inasmuch as the secondary retailer is, by definition, at least partially dependent upon the sale of the primary employer's goods, the secondary firm will necessarily feel the pressure of labor activity pointed at the primary enterprise. Thus, the pivotal problem in secondary site picketing cases is determining when the pressure imposed by consumer picketing is illegitimate, and therefore deemed to "coerce" the secondary retailer.

*Tree Fruits* addressed this problem by focusing upon whether picketing at the secondary site is directed at the primary employer's product, or whether it more broadly exhorts customers to withhold patronage from the full range of goods carried by the secondary retailer, *including those goods originating from nonprimary sources.* The *Tree Fruits* test reflects the distinction between economic damage sustained by the secondary firm solely by virtue of its dependence upon the primary employer's goods, and injuries inflicted upon interests of the secondary firm that are unrelated to the primary dispute—injuries that are calculated to influence the secondary retailer's conduct with respect to the primary dispute.

---

[1] As amended by the Labor-Management Reporting and Disclosure Act of 1959 (Landrum-Griffin Act), § 704 (a), 73 Stat. 542–543, 29 U. S. C. § 158 (b)(4).

The former sort of harm is simply the result of union success in its conflict with the primary employer. The secondary firm is hurt only insofar as it entwines its economic fate with that of the primary employer by carrying the latter's goods. To be sure, the secondary site may be a battleground; but the secondary retailer, in its own right, is not enlisted as a combatant.

The latter kind of economic harm to the secondary firm, however, does not involve merely the necessary commercial fallout from the primary dispute. Appeals to boycott nonprimary goods sold by a secondary retailer place more at stake for the retailer than the risk it has assumed by handling the primary employer's product. Four considerations indicate that this broader pressure is highly undesirable from the standpoint of labor policy. First, nonprimary product boycotts distort the strength of consumer response to the primary dispute; the secondary retailer's decision to continue purchasing the primary employer's line becomes a function of consumer reaction to the primary conflict *amplified* by the impact of the boycott upon nonprimary goods. *Tree Fruits, supra,* at 72, and n. 20. Second, although it seems proper to compel the producer or retailer of an individual primary product to internalize the costs of labor conflict engendered in the course of the item's production, a nonprimary product boycott may unfairly impose multiple costs upon the secondary retailer who does not wish to terminate his relationship with the primary employer. Third, nonprimary product boycotts attack interests of the secondary firm that are not derivative of the interests of the primary enterprise; because the retailer thereby becomes an independent disputant, the primary labor controversy may be aggravated and complicated. Finally, by affecting the sales of nonprimary goods handled by the secondary firm, the disruptive effect of the primary dispute is felt even by those businesses that manufacture and sell nonprimary products to the secondary retailer.

These sound reasons support *Tree Fruits'* conclusion that the legality of secondary site picketing should turn upon

whether the union pickets urge only a boycott of the primary employer's product. 377 U. S., at 63–64, 71–72.[2] Concomitantly, *Tree Fruits* expressly rejected the notion that the coerciveness of picketing should depend upon the extent of loss suffered by the secondary firm through diminished purchases of the primary product. *Id.,* at 72–73. Nevertheless, the Court has now apparently abandoned the *Tree Fruits* approach, choosing instead to identify coerciveness with the percentage of the secondary firm's business made up by the primary product.

The conceptual underpinnings of this new standard are seriously flawed. The type of economic pressure exerted upon the secondary retailer by a primary product boycott is the same whatever the percentage of its business the primary product composes—in each case, a decline in sales at the secondary outlet may well lead either to a decrease in purchases from the primary employer or to product substitution. To be sure, the damaging effect of this pressure upon individual secondary firms will vary, but it is far from clear that the harmfulness of a primary product boycott is necessarily correlated with the percentage of the secondary firm's business the product constitutes. For example, a marginally profitable large retailer may handle a multiplicity of products, yet find the decrease in sales of a single, very profitable, primary product ruinous. A small healthy single product secondary retailer, on the other hand, might be able to sustain losses during a boycott, or substitute a comparable product.

---

[2] Because a "merged product" consists in part of nonprimary products, the prohibition of "merged product" boycotts follows as a matter of logic and of policy from *Tree Fruits'* primary product boycott test. Thus, "merged product" cases, see, *e. g., American Bread Co.* v. *NLRB,* 411 F. 2d 147, 154 (CA6 1969), do not support the Court's view that certain purely primary product boycotts are proscribed by the National Labor Relations Act. In fact, "merged product" boycotts are wholly different than primary product boycotts against single product retailers. "Merged product" boycotts need not entail a total withholding of patronage from the secondary retailer, which may carry other, nonmerged, products.

Moreover, it is odd to treat the NLRA's prohibition against coercion of neutral secondary parties as a means of protecting single product secondary firms from the effects of a successful primary product boycott. A single product retailer will always suffer a degree of harm incident to a successful primary product boycott, whether or not the retailer becomes the focus of union activity. Thus, a ban on coercion of neutral businesses is mismatched to the goal of averting that harm. Far more sensible would be to read the statutory ban on coercion of neutral parties as shielding secondary firms from the injuries that ensue precisely because of union conduct aimed at them. Nonprimary product boycotts fall within this category because they are specifically targeted at the secondary retailer.

Unlike the *Tree Fruits* rule, the test formulated by the Court in this case is not rooted in the policy of maintaining secondary firm neutrality with respect to the primary dispute. There is no ground to believe that a single product secondary retailer is more prone than a multiproduct retailer to react to a primary product boycott by joining the union in its struggle against the primary employer. On the contrary, the single product secondary firm is likely to be the primary employer's strongest ally because of the alignment of their respective economic interests. Nor is it especially unfair to subject the single product retailer to a primary product boycott. Whatever the percentage of a retailer's business that is constituted by a given item, the retailer necessarily assumes the risks of interrupted supply or declining sales that follow when labor conflict embroils the manufacturer of the item.

By shifting its focus from the nature of the product boycotted to the composition of the secondary firm's business, today's decision substitutes a confusing and unsteady standard for *Tree Fruits'* clear approach to secondary site picketing. Labor unions will no longer be able to assure that their secondary site picketing is lawful by restricting advocacy of a boycott to the primary product, as ordained by *Tree Fruits.*

Instead, picketers will be compelled to guess whether the primary product makes up a sufficient proportion of the retailer's business to trigger the displeasure of the courts or the Labor Relations Board. Indeed, the Court's general disapproval of "[p]roduct picketing that reasonably can be expected to threaten neutral parties with ruin or substantial loss . . . ," *ante,* at 614, leaves one wondering whether unions will also have to inspect balance sheets to determine whether the primary product they wish to picket is too profitable for the secondary firm.

I continue to "disagree . . . that the test of 'to threaten, coerce, or restrain' . . . is whether [the secondary retailer] suffered or was likely to suffer economic loss." *Tree Fruits, supra,* at 72.[3] I would adhere to the primary product test. Accordingly, I dissent.

---

[3] The only fragment of legislative history the Court musters in support of its holding forbidding picketing of single product secondary firms is Senator McClellan's expression of concern that some secondary firms may have developed their business entirely on the basis of " 'a particular brand of product.' " *Ante,* at 615, n. 10, quoting 105 Cong. Rec. 6667 (1959), reprinted in 2 National Labor Relations Board, Legislative History of the Labor-Management Reporting and Disclosure Act of 1959, p. 1194 (1959). But that remark was offered in support of a proposed amendment restricting secondary boycotts that was rejected by the Senate. 2 Legislative History, *supra,* at IX. Section 8 (b)(4) as finally enacted was narrower than Senator McClellan's proposed amendment. See Comment, 32 Stan. L. Rev. 631, 641–642, n. 61 (1980).