The KROGER COMPANY, Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent.

DURO PAPER BAG MANUFACTURING
CO., Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent.

Nos. 78–1372, 78–1417.

United States Court of Appeals,
Sixth Circuit.

Argued July 10, 1980.

Decided Oct. 27, 1980.

Rehearing and Rehearing En Banc
Denied Dec. 29, 1980.

Thomas E. Murphy, Kroger Company Law Department, Cincinnati, Ohio, for Kroger Co.

Lawrence J. Barty, Taft, Stettinius & Hollister, Cincinnati, Ohio, for Duro Paper Bag Mfg. Co.

Elliott Moore, Deputy Associate Gen. Counsel, Howard Perlstein, Catherine Garcia, N. L. R. B., Washington, D. C., Emil C. Farkas, Director Region 9, N. L. R. B., Cincinnati, Ohio, for N. L. R. B.

Before MERRITT, KENNEDY and BOYCE F. MARTIN, Jr., Circuit Judges.

CORNELIA G. KENNEDY, Circuit Judge.

The Kroger Co. and Duro Paper Bag Mfg. Co. appeal the National Labor Relations Board's (NLRB) dismissal of charges that the United Paper Workers International Union, Local 832, had engaged in an unfair labor practice by picketing to promote a secondary boycott against Kroger in violation of § 8(b)(4)(ii)(B) of the National Labor Relations Act, 29 U.S.C. 151, *et seq.* (NLRA).

Kroger is engaged in the retail grocery business, and in May 1977 operated grocery stores in Ludlow and Covington Kentucky. Duro, a manufacturer of paper bags, was the exclusive supplier of paper bags used by Kroger customers for carrying groceries. Although Kroger routinely furnishes boxes instead of bags to the few customers who request them, Duro bags were the almost universal means used by Kroger to convey groceries to its customers.

Local 832 is the exclusive bargaining representative for Duro's production employees, who were engaged in a lawful economic strike against Duro during the first half of 1977. Although Local 832 had no labor dispute with Kroger, it established pickets at the Covington store on May 19 and May 29, 1977, and at the Ludlow store on May 20 and May 23, 1977. Throughout normal operating hours the pickets carried signs reading:

CONSUMER BOYCOTT

OF

DURO PAPER BAG

MANUFACTURING CO. PRODUCTS

B.Y.O.B.

(BRING YOUR OWN BAG)

DURO PAPER BAG MFG. CO.

UNFAIR

LOCAL 832, UNITED PAPERWORKERS
INT'L UNION, AFL–CIO

The picketers also distributed handbills which, in addition to asking shoppers not to use Duro bags, urged them to ask Kroger for boxes rather than bags, or to supply their own means of carrying the groceries home. The handbills explicitly stated that the Union's only dispute was with Duro, and not with any other employer. The distribution of the handbills is not challenged.

2800 customers shopped at the Covington store during the two days of picketing, of whom 85 requested boxes. Kroger was able to satisfy 70 of the requests before its supply of boxes was exhausted. 1500 customers shopped at the Ludlow store, of whom 65 requested boxes, with Kroger able to satisfy only 30 of the requests. Thus, Kroger was able to provide enough boxes for only 2½% of its customers to comply with the Union's appeal. A few customers utilized their own containers, such as pillow cases, bags, or boxes, to transport their groceries yet comply with the pickets' request. However, at the Ludlow store, on May 20, one customer refused to accept her purchase in "scab bags," and left the store without paying for or taking the groceries.

On May 23, 1977, Duro charged Local 832 with engaging in unfair labor practices. On August 19, 1977, the General Counsel of the NLRB filed a complaint against Local 832 pursuant to Section 10(b) of the NLRA. The parties waived a formal hearing before the Administrative Law Judge, so that the record for the Board's decision consisted solely of the stipulated facts and exhibits. On July 14, 1978, the NLRB found that the picketing did not impermissibly urge a secondary boycott of Kroger, and dismissed the complaint. 236 N.L.R.B. 1525 (1978). The NLRB based its decision on a finding that shoppers could patronize Kroger's stores without using paper bags to carry their groceries. 236 N.L.R.B. 1527. The Board relied on the future availability of boxes as an alternative and on the fact that a few customers did supply their own containers during the boycott, to conclude that paper bags were not necessary to sell groceries, and thus did not lose their identity by merging into the overall operation of the store. *Id.* The Board also concluded that because Kroger could (and in fact, did) sell groceries without bags, the Union's appeal to consumers not to use bags was not an appeal to cease patronizing Kroger entirely, when as here the pickets made it clear that Kroger was not the object of the boycott. Therefore, it found no violation of § 8(b)(4)(ii)(B).

Finding that the record as a whole lacks substantial evidence to support the Board's decision, we set aside its dismissal of the complaint.

The record in this case was limited to the facts and exhibits stipulated by the parties. The stipulation states that during the picketing Kroger could supply only 2½% of its customers with boxes as an alternative to the Duro bags. The Board dismissed this fact with the assertion that it only demonstrated the "present unavailability" of the boxes, and the claim that "logic dictates that there were means other than using paper bags available." 236 N.L.R.B. 1527. However, the record is devoid of evidence that the future availability of boxes would be sufficient to supply all customers with boxes instead of bags. The only boxes available to a supermarket are those in which goods are received. Logic dictates that a greater number of boxes would be required to transport customers' groceries than were required to bring the groceries to the store. When received, items of a common size and shape are efficiently packed. The customer's purchases are of all sizes and shapes and cannot be packed in the same space. The customer is unlikely to tailor his purchases to fit the capacity of the boxes at hand. Some boxes are too large or too small to be of any use to customers carrying groceries. At least some are certain to be unfit for reuse after their receipt by the store. Moreover, many large volume products such as bread and milk are not delivered in boxes. Thus, used boxes could not be relied upon to carry out of a supermarket all of the produce that comes in. In addition, where Kroger could store a thousand empty boxes remains unanswered.

■ We are also unable to find evidence in the record that any other meaningful alternatives to paper bags exist.[1] The record does disclose that several customers brought their own means of carrying groceries with them. 236 N.L.R.B. 1526. However, the record also discloses that at least one customer did not do so, and then refused to purchase her groceries in "scab bags." *Id.* Those 50 customers who asked for boxes but could not get them did not have an alternative available, and simply accepted their groceries in Duro bags rather than comply with the boycott.

1. We are not persuaded that Judge Merritt's other suggestions of alternatives to grocery bags are feasible. He appropriately limits the suggestion that unbagged groceries be placed directly in the shopper's car to the first trip; it is unlikely that anyone would utilize that unsatisfactory procedure—including unloading the unbagged groceries on reaching home—more than once. He suggests that Kroger could furnish the big trash bags that it sells. Kroger could undoubtedly provide other bags to ameliorate the problem. The secondary boycott statute is intended, however, to prohibit picketing which pressures Kroger to choose between retaining its customers and continuing to deal with Duro.

The vast majority of customers would receive their first notice of the pickets' demands upon arriving at the store. To comply with the boycott, they would either have to find an alternative to bags, or shop at another store. In the absence of any evidence we cannot agree with the Board that even customers who *are* forewarned and who wish to comply with the boycott will make the effort of bringing their own bags, rather than simply patronizing another store that uses another brand of paper bag. Thus, although it is theoretically true that Kroger shoppers can reject the paper bags, yet continue to buy at Kroger by bringing their own bags, there is no evidence that it is true as a practical matter. Moreover, shoppers who do so will receive less than they pay for, since Kroger prices include the cost of providing bags.

■ We agree with the contention of the General Counsel of the NLRB before the Board (236 N.L.R.B. 1527) that the paper bags were necessary for Kroger to sell its groceries. The bags were part and parcel of every purchase made at the store. No meaningful alternative to their use was demonstrated in the record nor is one apparent. Because they were necessary, they lost their separate identity and merged into the operation of the store; a successful boycott of the Duro bags would have required a boycott of Kroger as well.

■ § 8(b)(4)(ii)(B) of the NLRA makes it an "unfair labor practice for a labor organization ... to threaten, coerce, or restrain any person engaged in commerce ... where ... an object thereof is ... forcing or requiring that person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer ... or to cease doing business with any other person ..." Congress passed § 8(b)(4)(ii)(B) to prevent a union

involved in a dispute with a primary employer from forcing a neutral secondary employer to enter the fray on the union's side to preserve its own business. *N. L. R. B. v. Fruit and Vegetable Packers Local 760*, 377 U.S. 58, 84 S.Ct. 1063, 12 L.Ed.2d 129 (1964) (hereinafter *Tree Fruits*). However, *Tree Fruits* created an exception to § 8(b)(4)(ii)(B) for picketing that does not urge a boycott of the neutral employer, but is a limited appeal to consumers to boycott the product of the primary employer.[2] The *Tree Fruits* exception to the statute rests on the ground that where a union seeks a consumer boycott of only one item among the many that make up a retailer's trade, the neutral has little reason to become involved in the primary employer's labor dispute. *National Labor Relations Board v. Retail Store Employees Union Local 1001*, 447 U.S. 607, 100 S.Ct. 2372, 65 L.Ed.2d 377 (1980) (hereinafter *Safeco*).[3] The NLRB's decision seeks to bring the picketing at Kroger's within *Tree Fruits*.

A well-established exception to the *Tree Fruits* exception to § 8(b)(4)(ii)(B) exists for struck products that are so merged with the secondary employer's total offering to the public that for all practical purposes, a boycott of the struck product is not separable from a boycott of the secondary employer. Merged product boycotts are essentially no different than the boycott of a single product secondary employer prohibited in *Safeco*. In both cases, a successful boycott of the struck product entails a boycott of substantially all of the secondary employer's business, thereby forcing it to choose between survival and severance of ties with the primary employer. "Successful secondary product picketing may have no greater effect upon a neutral than a legal primary boycott. But, when the neutral's business depends upon the products of a particular

---

**2.** In *Tree Fruits*, the Court permitted a union involved in a labor dispute with Washington State apple packers to picket a grocery store to urge its customers not to buy Washington State apples, as the picketing was aimed only at the product of the primary employer, and not at the grocers.

**3.** The *Safeco* Court held that, where a primary employer's product formed all or substantially all of a secondary employer's product, a picket urging a boycott of that product violated § 8(b)(4)(ii)(B), because it forced the secondary employer to choose between his own survival and severance of his ties with the primary employer.

primary employer, secondary product picketing can produce injury almost identical to the harm resulting from an illegal secondary boycott." *Safeco*, 447 U.S. 607, 614, n.8, 100 S.Ct. 2372, 2377, n.8. In such a case the boycott *cannot* be confined to the primary product. Thus, prohibiting the merged product boycott follows as a matter of logic and policy from *Safeco, Tree Fruits,* and § 8(b)(4)(ii)(B).

This Court had occasion to deal with a merged product in *American Bread Co. v. N. L. R. B.*, 411 F.2d 147 (6th Cir. 1969). In that case we upheld a NLRB decision which found a violation of § 8(b)(4)(ii)(B) where a union involved in a labor dispute with the manufacturer of Sunbeam Bread established pickets at a restaurant reading "TO THE CONSUMER—SUNBEAM BREAD SOLD HERE." Because the bread was part of almost every meal sold by the restaurant, "[it] had become so integrated into the food served that to cease purchasing the [bread] would almost amount to customers stopping all trade with the secondary employer." 411 F.2d at 154.[4]

In *American Bread*, it was physically possible for consumers to bring their own bread or go without, just as it was possible for Kroger shoppers to bring their own bags or go without. However, in both instances it was unrealistic to expect them to do so. As stated above, "to cease purchasing the [primary product] would almost amount to customers stopping all trade with the secondary employer." That is precisely the situation faced by Kroger in this case, and it is precisely the problem that Congress sought to avoid through § 8(b)(4)(ii)(B).

▇▇▇▇ The NLRB decision also placed some reliance on the fact that, as it turned out, Kroger continued its business despite the picketing. From this, the Board concluded that a general boycott of Kroger

was not an object of the picketing nor was it the likely result. The Board may reasonably rely on the actual effect of the picketing to determine whether it *was* intended to cause a boycott of the secondary employer. In such a case, what actually happens is a good indicator of what the union wanted to have happen. However, it may rely on the lack of effect to draw the opposite conclusion only where there is in fact substantial compliance on the part of the public with the request of the pickets. In this case, where only a negligible percentage of the Kroger customers attempted to comply with the boycott, the Board's reliance on the actual result of the picketing is misplaced.

The Union's placards were carefully drafted to refer only to the struck products. But, it was easily foreseeable that the paper bags could not be boycotted without boycotting the entire store. The fact that the pickets referred only to the Duro bags is of little import. In *Safeco* the Supreme Court explicitly rejected the proposition that the purpose of the picketing could be found only in the express words of the placards. The Court observed that such a test provides little or no protection to the secondary employer, because no well-advised union would allow secondary pickets to carry placards urging anything other than a struck product boycott. 447 U.S. at 614 n.8, 100 S.Ct. at 2377 n.8. Determining the object of labor union picketing is a recurring and necessary function of the Board, and the Board's determination is thus entitled to deference by the courts. *N. L. R. B. v. Local 103, Ironworkers*, 434 U.S. 335, 342, 98 S.Ct. 651, 656, 54 L.Ed.2d 586 (1978). In this case, however, the picketing could have had no object but a boycott of Kroger, in view of the fact that the paper bags were necessary to the stores' operation and Local 832's pickets called for a boycott of paper bags.

---

**4.** See also *K & K Construction Co., Inc. v. N. L. R. B.*, 592 F.2d 1228 (3d Cir. 1979) (the work done on houses by a construction contractor merged with the finished houses, so that picketing of the salesmen for the houses over a labor dispute with that contractor violated § 8(b)(4)(ii)(B)); *Honolulu Typographical Un-*

*ion No. 37 v. N. L. R. B.*, 401 F.2d 952 (D.C.Cir. 1968) (where a union had a primary dispute with a newspaper, it was illegal picketing of a secondary employer (one who advertised in the paper) to ask consumers to boycott advertised items); 170 N.L.R.B. 91 (1968).

§ 8(b)(4)(ii)(B) is addressed to picketing of the secondary employer where "an *object thereof*" is to drag that party into the primary dispute. (Emphasis supplied). Thus, the statute on its face is concerned with the purpose of the picketing, not with its actual effect. The statute has been so construed by the Supreme Court, first in *Tree Fruits* ("*If* the appeal [to the public] succeeds, the secondary employer's purchases from the struck firms are decreased only because the public has diminished its purchases of the struck product.") 377 U.S. at 72, 84 S.Ct. at 1071, and then in *Safeco*, ("Since *successful* secondary picketing would put [the secondary employer] to a choice between survival and the severance of ties with the [primary employer], the picketing plainly violates the statutory ban . . . .") 447 U.S. at 615, 100 S.Ct. at 2377.[5] (Emphases supplied) Thus, the Board should have restricted its inquiry to the likely result of the Union's appeal if it accomplished its object, a boycott of the Duro bags.

Because there is no substantial evidence in the record to support the Board's finding that cessation of business with Kroger would not have been the result of a successful boycott of Duro bags, we set aside its dismissal of the complaint against Local 832 and remand for further proceedings consistent with this opinion. *Universal Camera Corp. v. N. L. R. B.*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951).[6]

So Ordered.

MERRITT, Circuit Judge, dissenting.

A union in dispute with a grocery bag manufacturer, in order to induce consumers to boycott the bags, put up pickets at some Kroger stores where the bags were used to sack groceries at the counter. The pickets asked the customers not to use the bags. The NLRB found that the picketing did not and could not cause serious economic harm to the stores and ruled against Kroger's claim that the picketing constitutes an impermissible secondary boycott, an unfair labor practice under § 8(b)(4)(ii) of the Act.

I find the opinion of our Court on these facts unconvincing in light of the reasoning

---

5. There is language in *Safeco* which the dissent has seized upon that, taken out of context, can be construed to apply a standard for picketing based on the probability of harm to the secondary employer. In 447 U.S. at 615 n.11, 100 S.Ct. 2377 n.11, the Court states the relevant inquiry in future cases falling between the extremes of *Tree Fruits* and *Safeco*: "The critical question will be whether, by encouraging customers to reject the struck product, the secondary appeal is reasonably likely to threaten the neutral party with ruin or substantial loss." However, when read in light of the statutory language, and other parts of the *Safeco* opinion which refer to the effect of the picketing "if successful," the language in the footnote must be read to include the condition of a successful boycott.

6. The dissent would hold that the first amendment requires the NLRB and the courts to consider the success or the probability of success of labor picketing of a secondary employer before deciding that such picketing is illegal under § 8(b)(4)(ii)(B). We would find this a difficult question were it one of first impression. We believe, however, that the Supreme Court's treatment of the first amendment issue in *Safeco* is dispositive.

As we note in our opinion, the *Safeco* plurality clearly states that Congress may, consistent with the first amendment, ban all labor picketing whose *purpose* is to coerce a secondary employer to cease dealing with a primary employer. Justice Blackmun's concurrence agreed on this point; his concern was for other statutory bans on peaceful picketing. Justice Stevens also concurred, because he thought Congress could prohibit labor picketing of a secondary employer due to its inherently coercive nature. The *Safeco* dissenting justices did not mention the first amendment, but dealt only with the *Tree Fruits* doctrine as applied to the facts of *Safeco*. Thus, any concern for the first amendment on the part of the *Safeco* dissent must be reflected in *Tree Fruits*, and the majority in that case makes only one oblique reference to the first amendment issue. 377 U.S. at 63, 84 S.Ct. at 1066.

None of the opinions in *Safeco* give any indication that the Court had any knowledge of the success of the secondary picketing at issue in that case. Nor is there any reference to actual or probable impact of the picketing in the District of Columbia Court of Appeals decision, *Retail Store Employees Union, Local 1001 v. NLRB*, 627 F.2d 1133 (D.C.Cir., 1979), or in the NLRB's initial decision, *Retail Clerks Local 1001*, 226 N.L.R.B. No. 106 (1976).

Since the Supreme Court did not consider that the actual or probable success of the picketing was relevant to the first amendment issue, we are precluded from doing so.

of the Supreme Court in its recent secondary boycott opinion in the *Safeco* case, 447 U.S. 607, 100 S.Ct. 2372, 65 L.Ed.2d 377 (1980), adhering to and refining the *Tree Fruits* distinction between "enterprise" and "product" secondary picketing. Secondary picketing directed at the enterprise is illegal, but product picketing is illegal only under narrow circumstances: when it threatens the secondary employer with severe loss.

In *Safeco*, the neutral employer sold only one product. The Supreme Court, therefore, said that "the application" of the statute "to [prohibit] the picketing *in this case*" does not violate the First Amendment. This statement immediately follows footnote 11 in which the Court states the test to be applied in a case such as ours, a test designed to define a category of harmful product picketing that clearly falls outside the protection of the First Amendment:

> The picketing in *Tree Fruits* [apples at a neutral grocery store] and the picketing in this case [a particular brand of insurance at a neutral one-product insurance agency] are relatively extreme examples of the spectrum of conduct that the Board and the courts will encounter . . . . If secondary picketing were directed against a product representing a major portion of a neutral's business, but significantly less than that represented by a single dominant product, neither *Tree Fruits* nor today's decision necessarily would control. *The critical question would be whether*, by encouraging customers to reject the struck product, *the secondary appeal is reasonably likely to threaten the neutral party with ruin or substantial loss.* Resolution of the question in each case will be *entrusted to the Board's expertise.* 447 U.S. at 613, 100 S.Ct. at 2376 (emphasis added).

The essential points here are (1) the statement that the test under § 8(b)(4)(ii) is the reasonable likelihood of threatened "ruin or substantial loss" and (2) the statement that this factual finding is "entrusted" to the NLRB.

In addition, five members of the Court in *Safeco*—Justices Blackmun and Stevens, who wrote separate concurrences, and Justices Brennan, White and Marshall, who dissented—appear to believe even more strongly that secondary boycott cases such as this one in which the restriction on the picketers' speech is content-based raise "difficult First Amendment issues" (Blackmun, J., concurring), requiring the Court "to determine whether the method or manner of expression, considered in context, justifies the particular restriction" (Stevens, J., concurring).

The First Amendment problem inherent in any governmental prohibition of picketing based on the content of the message is what led the Supreme Court initially to adopt this construction of § 8(b)(4)(ii) in *Tree Fruits* distinguishing between enterprise and product picketing. In that case, Justice Brennan wrote for the Court that the reason for reconstructing the statute to include this distinction—an otherwise somewhat strained construction—was the Court's "concern that a broad ban against peaceful picketing might collide with the guarantees of the First Amendment." 377 U.S. at 63, 84 S.Ct. at 1066. Justice Black believed the statute unconstitutional because he was unwilling to reconstruct the statute in this way in light of what he conceived to be a clear legislative purpose to broadly ban all secondary picketing. 377 U.S. at 76–80, 84 S.Ct. at 1073–1075. Thus the distinction and the Supreme Court's refinement of it in *Safeco* are clearly based on First Amendment imperatives.

In this case I do not believe that the Board went beyond the range of administrative discretion "entrusted" to it in finding that this boycott of grocery bags would not cause Kroger substantial economic harm—whether the boycott were successful or not. The record is devoid of any facts suggesting that the boycott of the Kroger stores was "reasonably likely to threaten [Kroger] with ruin or substantial loss." In fact, the record is clear that the boycott had no effect at all on Kroger's business because consumers rejected the idea the boycott promoted.

It is true that we should not judge the legality of the boycott, the particular protest in question, entirely on the basis of whether the idea is accepted or rejected by the consumer. But I do not think our Court is correct in ruling out altogether any consideration of this factor and requiring us to assume—contrary to fact—that the boycott will be successful.

Our Court's conclusion that we must assume that all boycotts will be successful appears to violate First Amendment principles. In cases such as this where the prohibition against expression is based in part on content, the state must show a clear danger or compelling justification. Causing "ruin or substantial loss" to the neutral employer is such a justification. Our Court assumes that the "danger" of any secondary picketing will always be "clear and present," that the "justification" will always be "compelling." But in order for the expression to fall outside the protection of the First Amendment, it must not only be "*directed to inciting or producing imminent lawless action*" (ruin or substantial loss) it must also be "*likely to incite or produce such action.*" *Brandenburg v. Ohio,* 395 U.S. 444, 447, 89 S.Ct. 1827, 1829, 23 L.Ed.2d 430 (1969). Not only must the threatened harm be severe if it should occur; it must be likely to occur, not remote or just a possibility. Thus the harmless inciter, or the harmless labor picketer, is protected. See Brandeis, J. concurring in *Whitney v. California,* 274 U.S. 357, 377–78, 47 S.Ct. 641, 649, 71 L.Ed. 1095 (1927), overruled by *Brandenburg.* The facts in this case show that the picketing did not in fact, and was not "likely to produce," harm to the neutral employer.[1]

More recently, in *Police Department of Chicago v. Mosley,* 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972), and *Carey v. Brown,* 447 U.S. 455, 100 S.Ct. 2286, 65 L.Ed.2d 263 (1980), the Supreme Court struck down under equal treatment or content-neutrality principles of the First Amendment two statutes that prohibited picketing in front of schools and in front of homes, except that in both cases the statutes made an exception in the case of labor picketing. Labor picketing, but not other picketing, was allowed. Quiet residential streets, serene homes, and undisturbed classrooms were not thought sufficient state justification for a statute discriminating in favor of labor picketing. Surely then the negligible economic impact shown in this case is not sufficient justification for an application of a statute which discriminates against a particular kind of labor picketing on the basis of the product in question.

Here not only was the "danger" remote, the "justification" uncompelling. There was no danger in the theoretical sense, no justification for the state's interference with the citizen's liberty of expression because there was no possible harm. Even if we assume success, even if we assume that consumers at these Kroger stores had boycotted the bags, Kroger, in addition to using boxes, could have put the unbagged groceries directly from the market basket into the shopper's car on the first trip. On the second trip, the shoppers might have brought their own containers. Or Kroger

---

1. On the question of whether we must assume the "success" of the boycott, Judge Kennedy's opinion for the Court in its rejoinder to my argument, contained in the last footnote of Judge Kennedy's opinion, simply says that the Supreme Court in *Safeco* conclusively decided this issue, that *Safeco* is "dispositive." That argument is wrong. There is no language in *Safeco* that addresses this issue directly one way or the other, certainly no language that could be said to be "dispositive." The closest the Supreme Court comes to a discussion of the issue is in footnote 11 when it says the test is whether substantial loss is "reasonably likely." It also says in the last line of the opinion that the First Amendment does not invalidate a law which prohibits picketing that "*predictably* encourages" (emphasis added) the boycott of a secondary enterprise. Certainly, neither phrase—"reasonably likely" and "predictably encourage"—supports Judge Kennedy's view. Although neither phrase answers the question conclusively in favor of my position, both phrases suggest to me that we should assess the *actual*—the "likely," the "predictable"—risk of harm, not just the *abstract* risk assuming success. This is what the NLRB did, and it seems to me that proper First Amendment analysis requires it. The Supreme Court has said nothing in *Safeco* to the contrary.

might have found a way to increase its supply of boxes or it might have come up with some other solution such as furnishing market baskets temporarily or the big plastic trash bags that it sells. The point is that here the question, considered in context, is one of inconvenience, not impossibility, not financial disaster, not even serious economic harm. If consumers had complied with the boycott, Kroger could have, and no doubt would have, taken steps to ameliorate the problem.

Where an exercise of free speech is in question, I do not think we should be so quick to restrain it. In order for the expression to constitute a wrong against the neutral enterprise, the harmfulness of the words and conduct, as in "fighting words," fraud and libel cases, should be clearer and the foreseeable injury more serious and direct. Although I have no problem with enforcement of the Board's order without remand, a due respect for the First Amendment values should counsel us at the very least, if we are in doubt, to send the case back to the NLRB for reconsideration of the harm in light of *Safeco*.