**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

NATIONAL LABOR RELATIONS BOARD,

*Petitioner*,

v.

INTERNATIONAL ASSOCIATION OF BRIDGE, STRUCTURAL, ORNAMENTAL, AND REINFORCING IRON WORKERS, LOCAL 229, AFL-CIO,

*Respondent.*

No. 17-73210

NLRB No. 21-CC-183510

ORDER

Filed September 11, 2020

Before: Mary M. Schroeder and Johnnie B. Rawlinson, Circuit Judges, and Robert S. Lasnik,[*] District Judge.

Order;
Dissent by Judge Berzon;
Dissent by Judge Bumatay

---

[*] The Honorable Robert S. Lasnik, United States District Judge for the Western District of Washington, sitting by designation.

## SUMMARY[**]

### Labor Law

The panel denied a petition for panel rehearing and denied on behalf of the court a petition for rehearing en banc.

In its opinion, filed October 28, 2019, the panel granted the National Labor Relations Board's petition for enforcement of its order entered against International Association of Bridge, Structural, Ornamental and Reinforcing Iron Workers, Local 229, enjoining Local 229 from committing violations of the National Labor Relations Act ("NLRA"). The Board affirmed the administrative law judge's finding that Local 229 had violated Section 8(b)(4)(i)(B) of the NLRA by inducing or encouraging Commercial Metals Company's neutral employees to strike or stop work for the unlawful secondary purpose of furthering Local 229's primary labor dispute with Western Concrete Pumping.   The panel rejected Local 229's contention that the Board's application of the NLRA to its conduct punished expressive activity protected by the First Amendment.  Specifically, the panel refused to extend the Supreme Court's decision in *Reed v. Town of Gilbert*, 135 S. Ct. 2218 (2015), and refused to apply strict scrutiny to the analysis of Section 8(b)(4)(i)(B).  The panel explained that *Reed* involved content-based restrictions in a municipal ordinance regulating signs directed toward the general public,  whereas  this  case  involved  communications addressed to neutral employees within the tightly regulated

---

[**] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

contours of labor negotiations.  The panel held that the Board reasonably rejected Local 229's contention that Section 8(c) of the NLRA protected its communications because the Supreme Court has concluded that Section 8(c) does not immunize activities that violate Section 8(b)(4).  The panel held that the Board properly rejected the challenges asserted by Local 229 under the Religious Freedom Restoration Act and under the Thirteenth Amendment to the United States Constitution.  Finally, the panel held that the language of the Board's order adequately apprised Local 229 of its notice obligations.

Judge Berzon, joined by Judges Graber, Wardlaw, W. Fletcher, Paez, and Bumatay,  dissented from the denial of rehearing en banc because she would hold that the pure speech enjoined in this case was entitled to full First Amendment protection.  By declining to undertake any identity-, content-, or viewpoint-based analysis – including the strict scrutiny inquiry those features should have triggered – and instead relying on an inapposite Supreme Court opinion, *International Brotherhood of Electrical Workers v. NLRB*, 341 U.S. 694 (1951), the panel in this case relegated to second-class constitutional status the right of labor organizations  to speak on matters that may concern them greatly.

Judge Bumatay dissented from the denial of rehearing en banc.  He agreed with Judge Berzon that the case should have been taken en banc, and wrote separately to emphasize his views on why the Supreme Court's decision in *International Brotherhood of Electrical Workers v. NLRB*, 341 U.S. 694 (1951), was not binding in this case.

## COUNSEL

Greg P. Lauro (argued), Attorney; Elizabeth A. Heaney, Supervisory Attorney; David Habenstreit, Assistant General Counsel; Meredith Jason, Acting Deputy Associate General Counsel; John W. Kyle and Alice B. Stock, Deputy General Counsel; Peter B. Robb, General Counsel; National Labor Relations Board, Washington, D.C.; for Petitioner.

David A. Rosenfeld (argued) and Caitlin E. Gray, Weinberg Roger & Rosenfeld, Alameda, California, for Respondent.

## ORDER

The panel has unanimously voted to deny the Respondent's Petition for Panel Rehearing. Judge Rawlinson voted, and Judges Schroeder and Lasnik recommended, to deny the Petition for Rehearing En Banc.

The full court has been advised of the Petition for Rehearing En Banc. A judge of the court called for a vote on the Petition for Rehearing En Banc. A vote was taken, and a majority of the active judges of the court failed to vote for an en banc rehearing.

The Respondent's Petition for Panel Rehearing and Rehearing En Banc, filed December 12, 2019, is **DENIED**. No future petitions for rehearing or rehearing en banc will be entertained.

BERZON, Circuit Judge, joined by GRABER, WARDLAW, FLETCHER, PAEZ, and BUMATAY, Circuit Judges, dissenting from the denial of rehearing en banc:

Suppose that a devoted member of the American Vegetarian Society chooses to exercise her First Amendment right to the freedom of speech. Standing on a public sidewalk outside a McDonald's, she distributes to McDonald's employees pamphlets declaring that "Meat is Murder," detailing various criticisms of the meat industry, and asking them to stop working for McDonald's. Suppose, further, that a federal statute prohibits those affiliated with "anti-meat organizations" from "inducing or encouraging" employees of businesses that traffic in meat to "cease participation in the meat market," and that, pursuant to that statute, a federal court enjoins our vegetarian's peaceful distribution of pamphlets. Our vegetarian challenges the injunction as forbidden by the First Amendment.

The case presented by this challenge would be an easy one under current First Amendment doctrine. The imagined statute unconstitutionally discriminates on identity, content, and viewpoint bases. The statute unconstitutionally discriminates on the basis of the speaker's identity, because by its terms it prohibits the distribution of these pamphlets by those affiliated with "anti-meat organizations," whereas those not so affiliated could distribute them unimpeded. *See, e.g.*, *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 340 (2010). It unconstitutionally discriminates on the basis of content, because an affiliate of an anti-meat organization is left free to take to the sidewalk outside McDonald's to express her views on, say, the wages that McDonald's pays its workers—it is only meat-related speech that is proscribed. *See, e.g.*, *Boos v. Barry*, 485 U.S. 312, 317–22

(1988). And the statute unconstitutionally discriminates on the basis of viewpoint, because while pamphlets *encouraging* people to "cease participation in the meat market" are prohibited, a pamphlet *discouraging* such cessation—say, "Increase Meat Sales, Work for McDonald's"—remains permissible. *See, e.g.*, *R.A.V. v. City of St. Paul*, 505 U.S. 377, 388–92 (1992). The district court's injunction would be unlawful in each of these respects.

The facts and the statute at issue in this case mirror those in the hypothetical. *Nat'l Labor Relations Bd. v. International Ass'n of Bridge, Structural, Ornamental, & Reinforcing Iron Workers, Local 229*, 941 F.3d 902, 904 (2019) ("*Local 229*"). An agent of Local 229—a union concerned that an employer with which Commercial Metals Company (CMC) contracted was paying wages lower than the area standard—encouraged employees of CMC to cease work by circulating to employees via text message a link to a webpage, distributing flyers at the CMC worksite, speaking on two occasions with CMC employees at the worksite, and placing a phone call to one CMC employee. *Id.* The parties and the panel agreed that this activity was "pure speech"; it was peaceful, non-coercive, and did not include any picketing by the union.[1] *Id.* at 904–05. Moreover, the conduct peaceably encouraged by the union— the voluntary cessation of work by individual employees— was lawful. 29 U.S.C. § 163; *see also, e.g.*, *Am. Ship Bldg. Co. v. NLRB*, 380 U.S. 300, 310 (1965). The National Labor

---

[1] Another union, Operating Engineers Local 12, was picketing outside the jobsite at the time Local 229 engaged in these activities. Local 12's primary picketing over compliance with area standards was lawful. *See United Steelworkers of America, AFL-CIO v. NLRB*, 376 U.S. 492, 501–02 (1964). Neither the parties nor the panel asserted that Local 12's lawful picketing activity bears on the legality of Local 229's speech. *Local 229*, 941 F.3d at 904–05.

Relations Board nonetheless enjoined this speech pursuant to Section 8(b)(4)(i)(B) of the National Labor Relations Act, which prohibits unions from "inducing or encouraging" employees neutral to a labor dispute to cease work in support of the union's dispute with a separate contractor. 29 U.S.C. § 158(b)(4)(i)(B).

The NLRB's injunction would seem to pose the very same identity-, content-, and viewpoint-based discrimination problems as would be posed by the case of our imagined vegetarian: identity-based, because the speech could not have been enjoined if not for the fact that the speaker is a union; content-based, because the union would be free to distribute pamphlets bearing subject matter unrelated to employee relations; and viewpoint-based, because the union would be free to speak on the subject matter of CMC management-employee relations if the union were inducing and encouraging CMC employees to *continue* work rather than to cease it.

Why, then, has this Court denied to the union the First Amendment protection that it would surely have extended to our imagined vegetarian? One could be forgiven for answering: Because unions seem to operate under a different First Amendment than the one that protects the rest of us.

Much has been written about the apparently anomalous First Amendment status of unions. *See, e.g.*, Cynthia Estlund, *Are Unions a Constitutional Anomaly?*, 114 Mich. L. Rev. 169, 193–211 (2015); Catherine L. Fisk, *Is It Time for a New Free Speech Fight? Thoughts on Whether the First Amendment is a Friend or Foe of Labor*, 39 Berkeley J. Emp. & Lab. L. 253, 258–67 (2018); *see also* Case Comment, *NLRB v. International Ass'n of Bridge, Structural, Ornamental, & Reinforcing Iron Workers, Local 229*, 133 Harv. L. Rev. 2619, 2620–26 (2020). But the scholarly

engagement with that anomaly, as well as the development of labor doctrine in our courts, has always focused on the reasons *why*, and the particular contexts *where*, labor speech receives less constitutional protection than non-labor speech would. The panel opinion, by contrast, elides these difficult labor law questions and the rich history from which they spring. Instead, it treats this difficult case as squarely settled by a single 1951 Supreme Court precedent, *International Brotherhood of Electrical Workers v. NLRB*, 341 U.S. 694 (1951) ("*IBEW*"), which it treats as having held that even the "pure speech" here at issue may be enjoined without offending the First Amendment, because the words "induce or encourage" as used in Section 8(b)(4)(i)(B) are "broad enough to include in them every form of influence and persuasion." *Local 229*, 941 F.3d at 905–06 (quoting *IBEW*, 341 U.S. at 701–02).

As I shall show, *IBEW* does not compel, or even support, the result reached in the panel's decision. The only unlawful conduct at issue in *IBEW* consisted in the union's *picketing* activity directed at neutral employees, considered together with a subsequent phone call emphasizing the purpose of the picketing. *Id.* at 705. Those facts are critically different from those in this case, where the speech enjoined was not picketing. That difference is made all the more critical by the transformative developments in First Amendment doctrine that unfolded in the decades that followed *IBEW*, and, in particular, by the picketing-based theory that the Supreme Court adopted as its rationale for differential treatment of labor speech in the First Amendment context.

When contemporary doctrine is applied, there can be little doubt that the pure speech here enjoined is entitled to full First Amendment protection. By declining to undertake any identity-, content-, or viewpoint-based analysis—

including the strict scrutiny inquiry those features should have triggered—and instead relying on an inapposite, seventy-year-old Supreme Court opinion, the panel here has needlessly relegated to second-class constitutional status the right of labor organizations to speak peacefully and non-coercively on matters that may concern them greatly. And by refusing to hear this case en banc, our Court has acquiesced in a significant curtailment of the liberty secured by the First Amendment. I respectfully dissent.

## I.

In *IBEW*, the "principal question" was whether a union violated a prior version of Section 8(b)(4)(i)(B)'s prohibition on inducing or encouraging cessation of work for a secondary contractor "when, *by peaceful picketing*, the [union's] agent induced employees of a subcontractor on a construction project to engage in a strike in the course of their employment." 341 U.S. at 695–96 (emphasis added). Much of the opinion is devoted to the question whether the peaceful picketing there at issue fell within the statutory prohibition that is now Section 8(b)(4)(i)(B). *See generally id.*

Section 8(b)(4)(i)(B) makes it an unfair labor practice for a union to "induce or encourage any individuals employed by any person" to refuse "to perform any services" where the objective of such inducement or encouragement is "forcing or requiring any person . . . to cease doing business with any other person." 29 U.S.C. § 158(b)(4)(i)(B).[2] Interpreting the "intended breadth" of that statute, the Court remarked that "[t]he words 'induce or encourage' [as used in section

---

[2] When *IBEW* was decided, this provision was instead codified at 29 U.S.C. § 158(b)(4)(A).

8(b)(4)(i)(B)] are broad enough to include in them every form of influence and persuasion." *IBEW*, 341 U.S. at 701–02. Separately, in a single paragraph, the Court rejected a First Amendment challenge to the statute's proscription of the union's conduct. I quote that paragraph in its entirety:

> The prohibition of inducement or encouragement of secondary pressure by § 8(b)(4)(A) carries no unconstitutional abridgment of free speech. The inducement or encouragement in the instant case took the form of picketing followed by a telephone call emphasizing its purpose. The constitutionality of § 8(b)(4)(A) is here questioned only as to its possible relation to the freedom of speech guaranteed by the First Amendment. This provision has been sustained by several Courts of Appeals. The substantive evil condemned by Congress in § 8(b)(4) is the secondary boycott and we recently have recognized the constitutional right of states to proscribe picketing in furtherance of comparably unlawful objectives. There is no reason why Congress may not do likewise.

*Id.* at 705.

Although it begins with broad language, the quoted paragraph as a whole focuses on the particular type of speech at issue before the Court—"picketing followed by a telephone call emphasizing its purpose," *id.*, which is all that the National Labor Relations Board's order covered. Before the NLRB, the charging party argued only that the union's "*picketing*" had induced the cessation of work, *Int'l Bhd. of*

*Elec. Workers, Local 501*, 82 N.L.R.B 1028, 1042 (1949) (emphasis added), and the Board concluded accordingly that the union, "*by picketing*," had induced such cessation, *id.* at 1029 (emphasis added). The Second Circuit similarly understood that only picketing was at issue, holding that "the First Amendment does not excuse *picketing* to compel an employer . . . even though the pickets carry placards which bear statements of the grievances involved." *IBEW, Local 501 v. NLRB*, 181. F.2d 34, 40 (2nd Cir. 1950) (emphasis added).

Faced with that context, the Court reasoned that, given its recognition of "the constitutional right of states to proscribe *picketing* in furtherance of comparably unlawful objectives[, t]here is no reason why Congress may not do *likewise*." *Id.* (emphases added). There was not at the time, and there is not now, any comparable recognized constitutional right of states to proscribe peaceful, *non-picketing* speech. So the actual holding in *IBEW* was limited to picketing; it cannot be extended to the speech at issue here, which undisputedly was not picketing.

That *IBEW*'s constitutional reasoning extends only to picketing is confirmed by the Supreme Court precedents upon which it relied, each of which conditioned its holding on the unique First Amendment status of picketing. In *Giboney v. Empire Storage & Ice Co.*, the Supreme Court explained that "[p]icketing by an organized group is more than free speech, since it involves patrol of a particular locality and since the very presence of a picket line may induce action of one kind or another, quite irrespective of the nature of the ideas which are being disseminated." 336 U.S. 490, 503 n.6 (1949) (citation omitted). The Court accordingly concluded that "the state is not required to tolerate in all places . . . even peaceful picketing by an

individual." *Id.* at 501 (citation omitted). In *Building Service Employees International Union v. Gazzam*, the Supreme Court stated that, because "picketing is more than speech[,] . . . this Court has not hesitated to uphold a state's restraint of acts and conduct which are an abuse of *the right to picket*." 339 U.S. 532, 537 (1950) (emphasis added). *International Brotherhood of Teamsters v. Hanke* again emphasized that "while picketing has an ingredient of communication it cannot dogmatically be equated with the constitutionally protected freedom of speech," and went on to uphold yet another injunction against picketing. 339 U.S. 470, 474, 481 (1950). And in *Hughes v. Superior Court*, the Supreme Court summarized: "[W]hile picketing is a mode of communication it is inseparably something more and different." 339 U.S. 460, 464–65 (1950).[3]

In the decades that followed *IBEW*, two circuit courts ignored its picketing-specific context and reasoning, extending it to uphold against First Amendment challenge applications of Section 8(b)(4)(i)(B) to pure speech. *Warshawsky & Co. v. NLRB*, 182 F.3d 948, 952 (D.C. Cir. 1999); *NLRB v. Local Union No. 3, Int'l Bhd. of Elec. Workers*, 477 F.2d 260, 266 (2d Cir. 1973). In so holding, these opinions treated the opening sentence of the quoted

---

[3] Some of the circuit court decisions cited in *IBEW*'s brief constitutional section did not involve any picketing. *See IBEW*, 341 U.S. at 705 n.9. But to assess the significance of such citations, we must take note of the proposition in support of which they were cited: namely, that Section 8(b)(4)(i)(B) "has been sustained by several Courts of Appeals." *Id.* at 705. That proposition contains no reasoning whatsoever; it is entirely empirical. The actual holding unfolds in the subsequent two sentences. And for those propositions, the only citations are to Supreme Court precedents which, as I have demonstrated, explicitly condition their constitutional analyses on the unique First Amendment status of labor picketing.

paragraph as foreclosing any constitutional challenge to any application of Section 8(b)(4)(i)(B), disregarding the picketing context of the opinion and the picketing-specific reasoning of the paragraph as a whole. And the opinions did so without regard for any subsequent developments in First Amendment doctrine. *Warshasky*, 182 F.3d at 952; *Local Union No. 3*, 477 F.2d at 266; *see also* Case Comment, *NLRB v. IAB*, *Local 229*, 133 Harv. L. Rev. at 2621–23.

Relying on these unreasoned and nonbinding opinions, the panel here repeated their mistake, again relying on *IBEW*'s broad language while ignoring both the picketing-specific context of the case and the limited actual holding set forth later in the paragraph. *Local 229*, 941 F.3d at 905. From there, the panel invoked *IBEW*'s language interpreting the "intended breadth" of the statute to extend the picketing-specific constitutional holding to "every form of influence or persuasion"—erroneously transforming an interpretation of a statute into a sweeping constitutional holding. *IBEW*, 341 U.S. at 701–03; *Local 229*, 941 F.3d at 905.

## II.

The panel's uncritical extension of *IBEW* is particularly troubling in view of the seismic changes in First Amendment jurisprudence since *IBEW* was decided. The panel invoked the fact that *IBEW*'s brief constitutional analysis was conducted "[w]ithout applying strict scrutiny" as a reason to ignore all subsequent legal developments. *Id.* at 905 (citing *IBEW*, 341 U.S. at 699–700, 705). But *IBEW* was decided long before the Supreme Court articulated its First Amendment doctrines as to content-, viewpoint-, and identity-based discrimination in anything like their current form. The strict scrutiny standard applicable to such discrimination was at best in a nascent state; its application in the First Amendment context developed only gradually.

*See Police Dep't of City of Chicago v. Mosley*, 408 U.S. 92, 95 (1972) (collecting cases).

A few examples of the doctrinal developments that unfolded after *IBEW* was decided demonstrate the significance of this transformation. Take content discrimination: In *Boos v. Barry*, the District of Columbia had prohibited, within 500 feet of a foreign embassy, any sign tending to bring that foreign government into "public odium" or "disrepute." 485 U.S. 312, 315 (1988). The Supreme Court determined that the restriction was content-based because it proscribed "an entire category of speech— signs or displays critical of foreign governments." *Id.* at 319–21. Because the restriction was content-based, the Court applied strict scrutiny and concluded that, even assuming that the law furthered a compelling interest in protecting the "dignity" of foreign diplomats, it was not narrowly tailored to serve that interest in view of the less restrictive protections for embassies that prevailed across the rest of the country. *Id.* at 321–27. And although some language in the *Boos* Court's opinion suggests that the need to apply strict scrutiny depended upon the political nature of the speech prohibited and the public nature of the forum to which the prohibition applied, *id.* at 321, the Supreme Court has more recently backed away from any such limitations, repeatedly declaring that "content-based regulations of speech are subject to strict scrutiny" without regard to whether the speech is political or the forum public. *Nat'l Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361, 2371 (2018); *see also, e.g.*, *Reed v. Town of Gilbert*, 576 U.S. 155, 163–64 (2015).

Or consider viewpoint discrimination: In *R.A.V. v. City of St. Paul*, a municipal ordinance made it a misdemeanor to place on public or private property any "symbol, object,

appellation, characterization or graffiti . . . which one knows or has reasonable grounds to know arouses anger, alarm, or resentment in others on the basis of race, color, creed, religion or gender." 505 U.S. 377, 380 (1992). A state high court had interpreted the phrase "arouses anger, alarm or resentment in others" to limit the reach of the ordinance to "fighting words," which are generally denied First Amendment protection on account of the conduct element that they involve. *Id.* at 381. The Supreme Court determined that, even as applied to "fighting words," the ordinance went "beyond mere content discrimination[] to actual viewpoint discrimination" in that only fighting words which aroused "anger, alarm and resentment" in others were prohibited, while fighting words used "*in favor* of racial, color, etc., tolerance and equality" remained permissible. *Id.* at 391–92 (emphasis in original). Recognizing that viewpoint discrimination is even more offensive to First Amendment values than is content discrimination, the Court struck down the ordinance, declining to apply even the strict scrutiny standard that "mere content discrimination" would demand. *Id.* at 391–93. Thus, as to speech that involves a conduct element, as picketing does, the application of the unforgiving viewpoint discrimination doctrine is required by *R.A.V.* Where, as here, only "pure speech" is implicated, the doctrine's application should be even more uncontroversial. *Local 229*, 941 F.3d at 904–05.

Finally, consider the First Amendment doctrine concerning identity-based discrimination. In *Citizens United v. Federal Election Commission*, the Court confronted a federal statute which prohibited only corporations and unions from making, within 30 days of a primary or 60 days of a general election, "any broadcast, cable, or satellite communication" that "refers to a clearly identified candidate for Federal office." 558 U.S. 310, 320–21 (2010). The Court

explained the First Amendment problems posed when government "identifies certain preferred speakers" by law, writing that government may not "deprive the public of the right to determine for itself what speech and speakers are worthy of consideration. The First Amendment protects speech and speaker, and the ideas that flow from each." *Id.* at 340–41. Applying strict scrutiny and acknowledging that some identity-based restrictions may be justified when necessary to prevent interference with "certain government functions," the Court concluded that no such interest justified the statute's identity-based discrimination against corporations and unions, and accordingly held that the statute violated the First Amendment. *Id* at 341.

None of these now well-developed doctrines had yet been crystalized when the Supreme Court decided *IBEW*. Given such a sea change in First Amendment jurisprudence, a case that predates it would need to be quite directly on point to be controlling today. *IBEW,* with its picketing-specific reasoning, does not fit that bill.

It is not enough to assert flatly, as the panel did, that these First Amendment doctrines do not apply "within the highly regulated contours of labor negotiations," as though the fact that union activity is highly regulated permanently siloes it from otherwise generally applicable developments in constitutional law. *Local 229*, 941 F.3d at 906. The Supreme Court has recently applied these very doctrines in other highly regulated contexts, including those involving regulations of the pharmaceutical industry, *see Sorrell v. IMS Health, Inc.*, 564 U.S. 552, 563–66 (2011), and of licensed reproductive healthcare providers, *see Becerra*, 138 S. Ct. at 2371.

**III.**

Post-*IBEW* developments in the labor context specifically affirm that the "highly regulated" rationale cannot fly, and that it is instead the distinction between picketing and "pure speech" that has constitutional salience in the labor context.

After *IBEW* was decided, the Supreme Court made clear that although certain forms of labor *picketing* do not receive the full First Amendment protection that courts extend to other forms of speech, other labor speech does. As explained already, *IBEW*'s focus on secondary picketing in the First Amendment part of the opinion reflects that distinction. But it does so incompletely, for the Court had not yet decided any of the major cases concerning the First Amendment protection that political picketing enjoys, and so there was no need to explain why labor picketing should be treated differently.

*Police Dep't of the City of Chicago v. Mosley*, 408 U.S. 92 (1972), brought the problem into view. There, peaceful picketing on the subject of a labor dispute was the only type of picketing the City of Chicago permitted. *Id.* at 94–95. The Supreme Court held that Chicago's regime violated the First Amendment because it made the legality of peaceful picketing depend upon the subject matter of the message that such picketing advanced: "[A]bove all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Id.* at 95. If the content-discrimination doctrine precludes government from singling out picketing on the subject of a labor dispute as the only type of picketing permitted, it would seem straightforwardly to follow that a regime which singled out picketing on the subject of a labor

dispute as the only type of picketing prohibited would violate the First Amendment as well.

But the Supreme Court did not take that path. In *NLRB v. Retail Store Employees Union, Local 1001* ("*Safeco*"), unions embroiled in a labor dispute with an insurance company picketed outside agencies that sold the company's insurance policies, urging customers to boycott those policies. 447 U.S. 607, 609 (1980). The Court held that Section 8(b)(4)(ii)(B) lawfully prohibited this secondary consumer picketing, but the majority could not agree on an explanation for why the prohibition was permitted by the First Amendment.

Justice Powell, in a plurality opinion, treated the case as squarely controlled by *IBEW*'s picketing-specific reasoning. He wrote:

> Congress may prohibit secondary picketing calculated to persuade the customers of the secondary employer to cease trading with him in order to force him to cease dealing with, or to put pressure upon, the primary employer. Such picketing spreads labor discord by coercing a neutral party to join the fray. In *Electrical Workers v. NLRB*, 341 U.S. 694, 705 (1951) [("*IBEW*")], this Court expressly held that a prohibition on "picketing in furtherance of [such] unlawful objectives" did not offend the First Amendment. We perceive no reason to depart from that well-established understanding. *As applied to picketing* that predictably encourages consumers to boycott a secondary business, § 8(b)(4)(ii)(B) imposes no

> impermissible          restrictions          upon constitutionally protected speech.

*Id.* at 616 (some internal quotation marks and citations omitted) (emphasis added).

In a concurrence, Justice Stevens wrote that the First Amendment issue "is not quite as easy as the plurality would make it seem," offering an alternative rationale for upholding the prohibition on secondary labor picketing as consistent with the First Amendment. *Id.* at 618 (Stevens, J., concurring). Such picketing may be regulated without violating the constitution, he wrote, because it "is a mixture of conduct and communication. In the labor context, it is the conduct element rather than the particular idea being expressed that often provides the most persuasive deterrent to third persons about to enter a business establishment." *Id.* at 619.

*Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council* ("*DeBartolo*") emphasized, as Justice Stevens had in *Safeco*, that non-picketing labor speech is more protected by the First Amendment than is labor picketing. 485 U.S. 568, 575 (1988). The Court observed that "picketing is qualitatively different from other modes of communication" and cited Justice Stevens's *Safeco* concurrence for the proposition that the persuasive force of labor picketing draws its strength from such picketing's conduct element rather than from the force of the ideas expressed. *Id.* at 580 (internal quotation marks and citation omitted). Applying this distinction to the facts of the case—which involved union members distributing handbills "without any accompanying picketing or patrolling," *id.* at 571—the Court concluded that because the distribution of handbills constituted "mere persuasion," involving no

"intimidat[ion] by a line of picketers," construing the NLRA to prohibit secondary handbilling would raise "serious questions" about its compatibility with the First Amendment that prohibiting secondary picketing does not. *Id.* at 575–76, 580.

*DeBartolo* thus rejected the *Safeco* plurality's bare reliance on *IBEW* as the basis for upholding restrictions on labor picketing against First Amendment challenge. After *DeBartolo*, First Amendment challenges to restrictions on a union's expressive activity must be evaluated under the rationale that a majority of the Court there endorsed. If the expressive activity, like handbilling, lacks the conduct element that distinguishes labor picketing, the communication falls on the speech side of the *DeBartolo* line, and a serious First Amendment problem is posed.

Until now, our circuit has been faithful to the inquiry *DeBartolo* requires in such cases. In *Overstreet v. United Brotherhood of Carpenters and Joiners of America, Local Union 1506*, union members had held aloft large banners announcing a "labor dispute" and declaring "SHAME ON" certain (secondary) retailers. 409 F.3d 1199, 1201–02 (9th Cir. 2005). The union argued that its bannering activity was protected by the First Amendment, so this Court considered whether such bannering was more like the "mere persuasion" in *DeBartolo*, and therefore potentially entitled to full First Amendment protection, or more like the "intimidation by a line of picketers" in *Safeco*, and therefore unprotected. *Id.* at 1210–11 (citations omitted). Given the stationary nature of the bannering activity and the absence of any physical or symbolic barrier blocking the entrances to the retailers' establishments, this Court concluded that the handbilling in *DeBartolo* was more suitably analogous. *Id.* at 1211–16.

In this case, I note, *DeBartolo*'s speech-conduct distinction is more easily applied than in *Overstreet*. Sending text messages containing a link to a website and distributing flyers is manifestly more analogous to handbilling than it is to picketing: it is the content of the website and the flyer, rather than any intimidating conduct, that does the persuasive work. But the panel refused to undertake this simple analysis. Instead, without engaging at all with the reasoning of *Safeco*, *DeBartolo*, or *Overstreet*, the panel dismissed *DeBartolo* as inapposite because it concerned peaceful, non-picketing, non-coercive speech directed at consumers, whereas here the peaceful, non-picketing, non-coercive speech was directed at secondary employees. *Local 229*, 941 F.3d at 906. The opinion makes no attempt to explain why, as a First Amendment matter, the audience of the peaceful, non-picketing, non-coercive speech should make any difference. *See id.*

*DeBartolo* and *Overstreet* involved applications of Section 8(b)(4)(ii)(B), whereas this case concerns the application of Section 8(b)(4)(i)(B). But developments in First Amendment doctrine are not confined to the particular statutory context in which they arise. There is no principled reason why the First Amendment rationale developed by Justice Stevens in *Safeco* and subsequently incorporated by a majority of the Court in *DeBartolo* would be any less applicable to one statutory subsection than to the other.

Indeed, the difference in the underlying statutory subsections at issue undermines rather than strengthens the panel's reasoning. Section 8(b)(4)(ii)(B), at issue in *DeBartolo and Overstreet*, by its terms applies only when a labor organization "threaten[s], coerce[s], or restrain[s] any person engaged in commerce," such as a customer of a secondary business who is intimidated by picketing.

29 U.S.C. § 158(b)(4)(ii). In *DeBartolo*, as in *Overstreet,* our courts avoided the First Amendment problems that they explicitly acknowledged would be posed by applying Section 8 to peaceful, non-picketing, non-coercive speech by adopting a saving construction of Section 8(b)(4)(ii)(B). *DeBartolo*, 485 U.S. at 575–76, 580; *Overstreet*, 409 F.3d at 1211–12. In both cases, our courts interpreted "threaten, coerce, or restrain" in such a way that the statute did not reach the speech for which a prohibition would potentially violate the First Amendment. Section 8(b)(4)(i)(B), by contrast, frames its prohibition under the broader "induce or encourage" language as interpreted in *IBEW*, which, as the parties and the panel in this case agreed, admits of no such saving construction. 941 F.3d at 905; *see also* 29 U.S.C. § 158(b)(4)(i)(B). That difference in statutory language in no way mitigates the First Amendment problems acknowledged in *DeBartolo* and *Overstreet*; to the contrary, it requires us to confront head-on the serious but long-avoided First Amendment problems with identity-, content-, and viewpoint-based discrimination against non-picketing labor speech.

## IV.

Nothing in *IBEW* excuses the panel's avoidance of these problems. We cannot faithfully interpret any utterance of the Supreme Court in isolation from the context in which it arises, so we are frequently confronted with the question of just how broadly to interpret language which, taken out of context, may appear quite sweeping. By ignoring *IBEW*'s picketing-specific context, and refusing to consider the relevance of that context to the doctrine as it currently stands, the panel here adopted a disturbing approach to the application of precedents.

Consider *Mosley* once again. 408 U.S. 92 (1972). There, the Court stated, in sweeping terms and without qualification: "[A]bove all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Id.* at 95. This language, if taken on its face and treated with as little regard for modern doctrine as the panel here treated isolated sentences in *IBEW*, would squarely compel a victory for the union in this case, as there is no question that the injunction here at issue is content-discriminatory. What is more, this sweeping utterance in *Mosley* post-dates the sweeping utterance in *IBEW* that Section 8(b)(4)(i)(B) "carries no unconstitutional abridgment of free speech." 341 U.S. at 705. But the present state of the doctrine makes clear that we cannot take this sentence to have the far-reaching implications it may seem to have: we know that the government *does* sometimes have power to restrict speech on a content-discriminatory basis in a number of contexts— say, where a labor organization engages in secondary picketing, or, more generally, where a content discriminatory restriction on speech is narrowly tailored in service of a compelling state interest. *See, e.g.*, *DeBartolo*, 485 U.S. at 575; *Burson v. Freeman,* 504 U.S. 191, 198, 211 (1992). It does not follow from those nuances of modern doctrine that *Mosley* has been overruled; certainly no Supreme Court opinion has said so. Rather, we must view that isolated language from *Mosley* in the context of First Amendment jurisprudence as a whole. When we do, we see that *Mosley*'s *holding*—that the government may not constitutionally forbid peaceful non-labor picketing while permitting only labor picketing—remains intact.

My reading of *IBEW* as limited to picketing is no more or less an artificial narrowing of Supreme Court precedent than that uncontroversial gloss on *Mosley* would be. *IBEW*'s

*holding*—that because states may constitutionally proscribe picketing in furtherance of unlawful objectives, they may constitutionally proscribe "peaceful picketing" in service of a secondary boycott, 341 U.S. at 694, 703–05—similarly remains intact.

The possibility of en banc consideration accordingly presented this Court with a choice: to treat *IBEW* the same way we would treat *Mosley*, as appropriately limited to its actual holding, or instead to acquiesce in a new and needless constitutional anomaly—such that our generally applicable content-, viewpoint-, and identity-based discrimination First Amendment doctrines inexplicably exclude Section 8(b)(4)(i)(B) from their reach, and the explanation for differential treatment of picketing from other forms of labor speech for First Amendment purposes, adopted in *DeBartolo*, is inexplicably confined to Section 8(b)(4)(ii)(B) only. I submit that we should not accept such an anomaly unless there is clear Supreme Court precedent which requires us to accept it. As there is not, this Court's choice to acquiesce is an abdication of its responsibilities.

I respectfully dissent from the denial of rehearing en banc.

---

BUMATAY, Circuit Judge, dissenting from the denial of rehearing en banc.

I agree with Judge Berzon that this case should have been taken up en banc. I write separately to emphasize my views on why the Supreme Court's decision in *International Brotherhood of Electrical Workers, Local 501, A.F. of L. v. NLRB*, 341 U.S. 694 (1951) ("*IBEW*"), is not binding in this

case and why it is our duty to apply the Constitution—not extend precedent—here.

## I.

As inferior court judges, we are bound to follow Supreme Court precedent. *Hart v. Massanari*, 266 F.3d 1155, 1170–71 (9th Cir. 2001). After all, "[f]idelity to precedent—the policy of *stare decisis*—is vital to the proper exercise of the judicial function." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 377 (2010) (Roberts, C.J., concurring). But our fidelity is not blind. We always have a "duty to interpret the Constitution in light of its text, structure, and original understanding." *NLRB v. Noel Canning*, 573 U.S. 513, 573 (2014) (Scalia, J., concurring). The same could be said of precedent that has been eroded by more recent jurisprudence.

This doesn't mean that lower court judges can refuse to follow precedent—even if subsequent caselaw or the original meaning cast it into doubt. *See Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989). Lower court judges don't have license to adopt "a cramped reading" of a case in order to "functionally overrule" it. *Thompson v. Marietta Educ. Ass'n*, No. 19-4217, 2020 WL 5015460, at *3 (6th Cir. Aug. 25, 2020). Nor are we permitted to create "razor-thin distinctions" to evade precedent's grasp. Josh Blackman, *Originalism and Stare Decisis in the Lower Courts*, 13 NYU J.L. & Liberty 44, 51 (2019).

But, where precedent is seriously questioned "as an original matter" or under current Supreme Court doctrine, courts "should tread carefully before extending" it. *Garza v. Idaho*, 139 S. Ct. 738, 756 (2019) (Thomas, J., dissenting). We can take care not to unduly expand precedents by reading

them "in light of and in the direction of the constitutional text and constitutional history." *Edmo v. Corizon, Inc.*, 949 F.3d 489, 506 (9th Cir. 2020) (Bumatay, J., dissenting). So too with intervening Supreme Court decisions. And if a faithful reading of precedent shows it is not directly controlling, the rule of law may dictate confining the precedent, rather than extending it further. *Cf. Citizens United*, 558 U.S. at 378 ("*[S]tare decisis* is not an end in itself. . . . Its greatest purpose is to serve a constitutional ideal—the rule of law. It follows that in the unusual circumstance when fidelity to any particular precedent does more to damage this constitutional ideal than to advance it, we must be more willing to depart from that precedent.").

## II.

At issue here are four forms of speech: (1) sending text messages; (2) making phone calls; (3) talking to others; and (4) delivering flyers. *NLRB v. Int'l Ass'n of Bridge, Structural, Ornamental, & Reinforcing Iron Workers, Local 229, AFL-CIO*, 941 F.3d 902, 904 (9th Cir. 2019). None these encompass the form of communication at issue in *IBEW*: picketing.

At the time of *IBEW*, "picketing" was considered *sui generis* under Supreme Court doctrine. "Picketing by an organized group is *more than free speech*[.]" *Bakery & Pastry Drivers & Helpers Local 802 of Int'l Brotherhood of Teamsters v. Wohl*, 315 U.S. 769, 776 (1942) (Douglas, J., concurring) (emphasis added). Picketing is distinct from other forms of speech, such as "distribution of circulars," because "it involves patrol of a particular locality and since the very presence of a picket line may induce action of one kind or another, quite irrespective of the nature of the ideas which are being disseminated." *Hughes v. Superior Court*, 339 U.S. 460, 464–65 (1950). Accordingly, *IBEW* made

clear that limitations on this form of communication pass constitutional muster. *See IBEW*, 341 U.S. at 705 ("[W]e . . . have recognized the constitutional right of states to proscribe picketing in furtherance of comparably unlawful objectives. There is no reason why Congress may not do likewise.") (footnote omitted). *IBEW*'s reach is therefore limited to picketing.

On the other hand, the forms of speech involved in this case go to the heart of protected speech activity. For example, the Court has singled out leafletting, at least in the political realm, as "the essence of First Amendment expression." *McCullen v. Coakley*, 573 U.S. 464, 488–89 (2014) (quoting *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 347 (1995)). Indeed, "no form of speech is entitled to greater constitutional protection." *Id.* Likewise, the Court has extolled "one-on-one communication," like text messaging or calling someone, as perhaps "the most effective" and "[most] fundamental" speech. *Meyer v. Grant*, 486 U.S. 414, 424 (1988). Thus, under binding precedent, calling, texting, and leafleting are *constitutionally distinct* from picketing a business.

Given this backdrop, nothing in Supreme Court doctrine or principles of stare decisis require the extension of *IBEW* here. *IBEW* deals with picketing and this case does not. As the cases above show, this is not a "razor-thin" distinction. And as Judge Berzon ably demonstrates, *IBEW* cannot be squared with modern First Amendment law. *See* Dissent at 16 (Berzon, J., dissenting) ("Given such a sea change in First Amendment jurisprudence," *IBEW* "would need to be quite directly on point to be controlling today."). Indeed, it is impossible to escape the conclusion that Section 8(b)(4)(i)(B) of the National Labor Relations Act, 29 U.S.C. § 158(b)(4)(i)(B), constitutes an impermissible content-

based and viewpoint-based restriction on speech.  *See Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163, 168 (2015) ("Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional" and "[g]overnment discrimination among viewpoints—or the regulation of speech based on the specific motivating ideology or the opinion or perspective of the speaker—is a more blatant and egregious form of content discrimination") (simplified).

Also, I have doubts that § 158(b)(4)(i)(B), as applied here, would be consistent with the original meaning of the First Amendment.    That Amendment pronounces that "Congress shall make no law . . . abridging the freedom of speech."  U.S. Const. amend I.  While the contours of this language need further explication, and there is ongoing debate about its meaning among scholars, Justice Scalia articulated the convincing view that the First Amendment generally prevents government from proscribing speech on the basis of content, subject to "traditional categorical exceptions."  *R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 382–83 (1992) (identifying obscenity, defamation, and fighting words as examples of such exceptions).  Another persuasive view is that the First Amendment cemented the natural right to freely express one's thoughts, spoken or written, subject to restrictions for the common good.  *See* Jud Campbell, *Natural Rights and the First Amendment*, 127 Yale L.J. 246, 304–07 (2017).  But, under this view, "the Founders widely thought that the freedom to make well-intentioned statements of one's views belonged to a subset of natural rights . . . that could not be restricted in promotion of the public good and thus fell outside legislative authority to curtail."  *Id.* at 255–56.  As James Madison said, "[o]pinions are not the objects of legislation."  4 Annals of Cong. 934 (1794); *see also* Thomas Jefferson, *A Bill for*

*Establishing Religious Freedom* (1779) ("[T]he opinions of men are not the object of civil government, nor under its jurisdiction[.]").

Considering our growing understanding of the First Amendment's original meaning, I question whether Congress can abridge the type of expression at issue here, especially the common catchphrase, "friends don't let friends cross." *NLRB*, 941 F.3d at 904. Such an expression seems precisely like the type of "well-intentioned statement[] of opinion" that the Founders would have thought inalienable. *See* Campbell, *supra,* at 255–56, 284. By denying rehearing en banc, we've passed on a valuable opportunity to examine First Amendment history and further ground our own jurisprudence in the original meaning of the Constitution.

Because *IBEW* doesn't directly control our decision here, I respectfully dissent from the denial of rehearing en banc.