NOT RECOMMENDED FOR PUBLICATION
File Name: 23a0329n.06

No. 22-1330

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

|  |  |  |
|---|---|---|
| MIDWEST TERMINALS OF TOLEDO INTERNATIONAL, INC., | ) ) ) | **FILED** Jul 18, 2023 DEBORAH S. HUNT, Clerk |
| Plaintiff-Appellant, | ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO |
| v. | ) ) | |
| INTERNATIONAL LONGSHOREMEN'S ASSOCIATION, et al., | ) ) ) | OPINION |
| Defendants-Appellees. | ) ) | |

**Before: KETHLEDGE, WHITE, and BUSH, Circuit Judges.**

WHITE, J., delivered the opinion of the court in which BUSH, J., joined. KETHLEDGE, J. (pp. 20–22), delivered a separate dissenting opinion.

HELENE N. WHITE, Circuit Judge. In this action brought under Section 303 of the Labor Management Relations Act (LMRA), Plaintiff-Appellant Midwest Terminals of Toledo International, Inc. (Midwest) appeals the dismissal of its complaint for failure to state a claim. Because Midwest plausibly alleges a violation of Section 8(b)(4)(ii)(B) of the National Labor Relations Act (NLRA), we REVERSE and REMAND for further proceedings.

**I.**

**A.**

Midwest operates the Toledo Port in Maumee, Ohio.[1] Among other things, it employs workers to perform stevedoring[2] activities for incoming cargo ships. Defendant International

---

[1] For purposes of this appeal, we take as true the facts alleged in Midwest's second amended complaint. *Rudd v. City of Norton Shores*, 977 F.3d 503, 507 (6th Cir. 2020).

[2] A "stevedore" is "one who works at or is responsible for loading and unloading ships in port." *Merriam-Webster,* https://www.merriam-webster.com/dictionary/stevedore (last visited Nov. 10, 2022).

Longshoremen's Association (ILA) is a labor union representing longshoremen workers. It has approximately 200 local affiliates in port cities across America and Canada. Defendant International Longshoremen's Division-Great Lakes District Council (ILA Great Lakes) represents longshoremen in the Great Lakes area. Defendant International Longshoremen's Association Local 1982 (Local 1982) is an unincorporated labor organization that represented stevedoring personnel at Midwest before January 3, 2018.[3] Midwest and Local 1982 were once parties to a local collective bargaining agreement, but all contracts have since expired and there has not been a valid agreement in place since 2012.

In November 2016, the ILA president placed Local 1982 in trusteeship due to insolvency. The president appointed William Yockey—an ILA Vice President—as Trustee "to immediately take charge and control of the books, records, property, assets, funds and affairs." R. 64, PID 482. In December 2016, Mike Baker—ILA Vice President, Atlantic Coast District—was appointed as Co-Trustee. Since then, ILA has run Local 1982 through Yockey and Baker.

Midwest alleges that around April 25, 2017, to pressure Midwest into signing a new collective bargaining agreement, Yockey, Baker, and Defendants began a "plan of action" regarding the neutral[4] shipping companies that deliver cargo to Midwest's facility. *Id.* at PID 486. Specifically, Defendants—through Yockey and Baker—coordinated with the Lakes Pilots Association, Inc. (the LPA) to prevent neutral shipping companies from utilizing the Toledo Port.

Coast Guard regulations require that any ship entering or leaving the Toledo Port be captained by a licensed pilot. The LPA supplies professional piloting services to shipping

---

[3] On that date, Local 1982 was "decertified" when the union failed to garner the support of a majority of workers in the bargaining unit. R. 64, PID 479.

[4] The parties do not dispute that the shipping companies are "neutral" within the context of the labor dispute between Defendants and Midwest.

companies navigating the Great Lakes and associated ports, including the Toledo Port. The pilots referred by the LPA (the Pilots) are not employees of the LPA, but rather self-employed, independent contractors "who run their own independent businesses as individual Pilots." *Id.* at PID 487.

Midwest alleges that, essentially, Defendants and the Pilots agreed that whenever the Pilots saw Local 1982 members picketing at the Toledo Port, they would refuse to move ships for the neutral shipping companies. If a ship was outside the port, the Pilot would turn it around and refuse to dock at Midwest's facility; if a ship was already in the port, the Pilot would refuse to move it out of Midwest's facility. Without licensed pilots, the ships and cargo were effectively "trapped" at the Toledo Port. *Id.* at PID 495. Midwest alleges that Yockey admitted at a meeting with the Toledo-Lucas County Port Authority (the Port Authority) that the scheme's overall purpose was to force neutral shipping companies to abandon cargo at Midwest, and ultimately stop doing business with Midwest.

Midwest further claims that the picketing was not genuine because it was not directed at Midwest. According to the complaint, "[a]ll Midwest employees, even ILA Local 1982 members," crossed the "fake" pickets and reported to work; "[t]he only person(s) who honored [the picket lines] [were] the LPA Pilot[s] under the unlawful express or implied agreements with the Defendants." *Id.* at PID 488, 491. Thus, according to Midwest, the picketing was simply a predetermined signal to the Pilots to stop navigating the ships in order to "e[n]mesh" the private shipping companies in Defendants' labor dispute. *Id.* at PID 489.

Midwest contends that Defendants successfully executed this plan several times. On April 25, 2017, Defendants set up "fake" pickets near the Midwest docks. *Id.* at PID 488-89. The Pilots refused to board any ships or dock any ships while this picket was active, preventing one neutral

ship from leaving the dock and another from entering. Similar "fake" pickets occurred in October 2017, November 2017, April 2018, and May 2018. On each occasion, Pilots refused to move ships in or out of Midwest's docks, effectively trapping them. In May 2018, the Pilots' refusal to navigate trapped three ships for two weeks, until Midwest and the shipping companies obtained special permission from the Coast Guard to move the ships without a licensed pilot. Midwest alleges that as a direct result of Defendants "blockading the Toledo Port," it lost all international shipping business from May through October 2018. *Id.* at PID 496. Eventually, the Coast Guard prohibited the Pilots from coordinating with Defendants to stop interstate commerce, and ships began to successfully dock again in October 2018.

**B.**

Based on this alleged scheme, Midwest brought the instant action in federal court pursuant to Section 303 of the LMRA, 29 U.S.C. § 187, which confers a private right of action on persons injured by a union's unfair labor practices, as defined by Section 8(b)(4) of the NLRA.[5] Midwest's

---

[5] Section 8(b)(4) of the NLRA provides, in relevant part, that it shall be an unfair labor practice for a labor organization or its agents

   (i)  to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or

   (ii)  to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is

      (A)  forcing or requiring any employer or self-employed person to join any labor or employer organization or to enter into any agreement which is prohibited by subsection (e);

      (B)  forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person . . . Provided, That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing[.]

29 U.S.C. § 158(b)(4). Within the NLRA, the term "person" includes individuals, labor organizations, and corporations. 29 U.S.C. § 152(1).

second amended complaint alleges two violations of Section 8(b)(4): an unlawful "hot cargo" agreement[6] (Count I) and unlawful "secondary picketing" (Count II). R. 64. Defendants filed motions to dismiss the second amended complaint, which the district court granted. Midwest appeals the dismissal of Count II only, arguing that it stated a claim under Section 303 by plausibly alleging a violation of Section 8(b)(4)(ii).

In granting Defendants' motions to dismiss, the district court reasoned that Midwest did not allege that Defendants "forced, or tried to force, the Pilots not to board or dock the ships." R. 92, PID 738-39. Instead, according to the complaint, the Pilots voluntarily agreed to assist Defendants. Therefore, the district court concluded, "the Second Amended Complaint does not contain any allegations of force or coercion [of the Pilots] other than 'picketing,'" and peaceful picketing of the primary employer, by itself, is not an invalid secondary activity under Section 8(b)(4). *Id.* at PID 739.

The district court next held that Midwest failed to allege coercion of the neutral shipping companies because that claim rested on "allegations that Defendants engaged in picketing for the purpose of signaling to the Pilots that they should not bring ships in or out of Midwest's port." *Id.* at PID 740. And the "mere fact that Defendants engaged in picketing" does not plausibly suggest that they threatened, coerced, or restrained the shipping companies. *Id.* PID 740-41. Finally, the district court noted that Midwest's claim of coercion of the neutral shipping companies rested

> on a theory of derivative liability–Defendants asked the Pilots, and the Pilots agreed, to do something which Defendants were not permitted to do themselves and, therefore, Defendants should be held liable. But Midwest offers no basis on

---

[6] Section 8(e) of the NLRA states:

It shall be an unfair labor practice for any labor organization and any employer to enter into any contract or agreement, express or implied, whereby such employer ceases or refrains or agrees to cease or refrain from handling, using, selling, transporting or otherwise dealing in any of the products of any other employer, or to cease doing business with any other person[.]

29 U.S.C. § 158(e). These prohibited agreements are known as "hot cargo" agreements.

which Defendants may be deemed to have undertaken the actions of an unaffiliated third party. The Second Amended Complaint does not include any allegations that the Pilots acted as Defendants' agents (rather than of their own volition) when they chose not to board the ships. Claims under § 8(b)(4)(ii)(B) must plausibly allege both a conduct component and a purpose component. Midwest has not plausibly alleged Defendants engaged in prohibited conduct against the international shipping companies.

*Id.* at PID 741.

## II.

We review de novo a district court's decision to grant a motion to dismiss for failure to state a claim. *Lambert v. Hartman*, 517 F.3d 433, 438–39 (6th Cir. 2008). To survive a motion to dismiss, a plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citation omitted).

## III.

Midwest's sole argument on appeal is that the district court erred in dismissing Count II because the operative complaint plausibly alleges a violation of Section 8(b)(4)(ii)(B)—and in turn, adequately states a claim under Section 303.

## A.

Congress passed Section 8(b)(4)(ii)(B) to prevent unions from dragging neutral parties into their labor disputes. *NLRB v. Retail Store Emp. Union, Loc. 1001 (Safeco)*, 447 U.S. 607, 612, 615 (1980) ("Congress intended to protect secondary parties from pressures that might embroil them in the labor disputes of others[.]"). This provision of the NLRA forbids "secondary boycotts," where the object of that boycott is to force a neutral party, with whom the union has no dispute, into ceasing business with the union members' primary employer. *Kentov v. Sheet Metal*

*Workers' Int'l Ass'n Loc. 15, AFL-CIO*, 418 F.3d 1259, 1263 (11th Cir. 2005). Specifically, it

provides that labor organizations and their agents may not

> threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce [with the object of] . . . forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person.

29 U.S.C. § 158(b)(4)(ii)(B). Both elements—prohibited conduct and a prohibited object—must

be present to allege a plausible violation of Section 8(b)(4)(ii)(B). *Kentov*, 418 F.3d at 1263.

**B.**

Midwest's complaint adequately alleges a prohibited object. It describes a specific meeting

with the Port Authority, on April 27, 2017, at which Yockey allegedly admitted that "his goal was

to have these neutral shipping companies abandon the cargo at Midwest" in order "to force or

require these International Shipping Companies and their Midwest customers, whose cargo were

on those ships, to stop doing business with Midwest." R. 64, PID 489-90. This plausibly alleges

a prohibited objective under the NLRA. *See F.A. Wilhelm Const. Co. v. Ky. State Dist. Council of

Carpenters, AFL-CIO*, 293 F.3d 935, 940 (6th Cir. 2002) (explaining that an allegation that one of

the union's objectives was to influence a neutral party to bring pressure to bear on the primary

employer is sufficient for alleging a "prohibited object" under the NLRA); *see also Serv. Emps.

Int'l Union Loc. 525, AFL-CIO*, 329 NLRB 638, 675 (1999) (explaining that the phrase "cease

doing business" is not "literally construed to require a total termination of a business relationship

between the secondary and primary employers," but meant to include "conduct which is intended

or likely to disrupt or alter the business dealings between the two").

**C.**

Accordingly, this appeal turns on the first element:  whether the complaint plausibly alleges prohibited conduct under the NLRA.  Taking the complaint's plausible allegations as true, Defendants planned and effectuated periodic "blockades" of the Toledo Port by signaling the Pilots to stop navigating neutral cargo ships into or out of the Toledo Port.  This effectively trapped ships at the Toledo Port at Defendants' request, because only licensed pilots can navigate the ships under Coast Guard regulations.  The neutral shipping companies allegedly avoided docking at Midwest and the Toledo Port for several months due to this activity.  The issue is whether these allegations rise to the level of unlawful "threaten[ing], coerc[ing], or restrain[ing]" that the secondary boycott provision is designed to prohibit.  29 U.S.C. § 158(b)(4)(ii).

Not all secondary activity is unlawful.  *See Local 761, Int'l Union of Elec., Radio & Mach. Workers, AFL-NLRB*, 366 U.S. 667, 672 (1961).  Indeed, unions are "free to use persuasion, including picketing, not only on the primary employer and his employees" but also upon "secondary employers who were customers or suppliers of the primary employer and persons dealing with them."  *Id.* (quoting *NLRB v. Local 294, Int'l Bhd. of Teamsters*, 284 F.2d 887, 889 (2d Cir. 1960)).  But labor organizations may not "threaten, coerce, or restrain" others in commerce under the guise of lawful secondary activity.  *See* 29 U.S.C. § 158(b)(4)(ii).

In this case, Defendants' arrangement with the Pilots does not fit the traditional understanding of a secondary boycott.  *See generally NLRB v. Denver Bldg. & Const. Trades Council*, 341 U.S. 675, 686-88 (1951) (describing a classic secondary boycott).  But that is not necessarily fatal to Midwest's claim.  *See Pye v. Teamsters Loc. Union No. 122*, 61 F.3d 1013, 1024 (1st Cir. 1995) (noting that the union's activity of group shopping was "a new twist" on the secondary boycott, but it nonetheless plausibly fit within the bounds of the NLRA because it

constituted "economic pressure"). Courts and the National Labor Relations Board (NLRB) have defined "coercion" expansively under the NLRA, encompassing not only strikes and picketing, but any "economic retaliation or pressure in a background of a labor dispute." *Sheet Metal Workers Loc. 91*, 294 NLRB 766, 775 (1989) (quoting *Sheet Metal Workers Local 418*, 235 NLRB 144, 146 (1978) (internal quotation marks omitted)). This includes such disparate activities as using a stereo system at excessive volumes,[7] group shopping trips,[8] imposing internal union discipline,[9] and refusing to refer employees for work.[10]

Here, according to the complaint, Defendants successfully orchestrated intermittent blockades of the Toledo Port, which led neutral shipping companies to cease dealing with Midwest for several months. This kind of economic pressure has historically constituted coercion of a neutral party within the meaning of Section 8(b)(4)(ii)(B). *See Safeco*, 447 U.S. at 612-13, 615 (finding that a union's conduct would put neutral companies "to a choice between their survival and the severance of their ties with [the union members' employer]"; therefore that conduct "plainly violate[d] the statutory ban on the coercion of neutrals"); *see also Kroger Co. v. NLRB*, 647 F.2d 634, 637 (6th Cir. 1980) ("Congress passed [Section] 8(b)(4)(ii)(B) to prevent a union

---

[7] *See In re Metro. Reg'l Council of Philadelphia & Vicinity, United Bhd. of Carpenters & Joiners of Am., AFL-CIO*, 335 NLRB 814 (2001) (finding a violation of Section 8(b)(4)(ii)(B) when union picketers played repeated, amplified broadcasts with the object of forcing neutral apartment complexes to cease doing business with nonunion employers providing workers during a labor dispute).

[8] *See Pye*, 61 F.3d at 1024 (classifying group shopping trips—which included union members using up virtually all of a store's parking lot, occupying much of the store's interior shopping area, and causing long checkout lines through repeated purchases of small items with large bills—as a form of economic pressure on a neutral customer of the primary employer, and thus a form of coercion under Section 8(b)(4)(ii)(B)).

[9] *See Sheet Metal Workers Loc. 104 (Losli Int'l)*, 297 NLRB 1078 (1990) (holding that a union violated Section 8(b)(4)(ii)(B) by bringing contrived disciplinary charges against one of its members—the president of a neutral company—with the intent of coercing that neutral company into ceasing business with the primary employer).

[10] *See Plumbers (AFL-CIO) Loc. 5 (Arthur Venneri Co.)*, 137 NLRB 828 (1962) (holding that a union engaged in prohibited coercion of a neutral party by refusing to refer plumbers to a neutral subcontractor to coerce the general contractor into ceasing business with a separate, non-union subcontractor).

involved in a dispute with a primary employer from forcing a neutral secondary employer to enter the fray on the union's side to preserve its own business.").

Yet the district court found that Midwest did not plausibly allege prohibited conduct. Its reasoning is unpersuasive. First, it concluded that the Section 8(b)(4)(ii)(B) claim must fail because it "rests on [Midwest's] allegations that Defendants engaged in picketing for the purpose of signaling to the Pilots that they should not bring ships in or out of Midwest's port," and the "mere fact" that Defendants engaged in picketing does not plausibly suggest threats, coercion, or restraint. R. 92, PID 740-41. But the complaint alleges more than mere picketing. It claims that Defendants deliberately targeted neutral shipping companies by approaching the Pilots before any land or water picketing took place, and by entering into an agreement with the Pilots to coordinate efforts. The alleged goal of this coordination was to freeze neutral cargo ships in the Toledo Port, but only after receiving a predetermined signal from Defendants. Although that signal happened to be a picket, Midwest sets forth in detail why these pickets were not true pickets and were instead a pre-arranged, coded signal from Defendants to the Pilots to set the blockade in motion. It is this overall plan, of which the purported picketing was only one part, that Midwest claims violated the NLRA.

Accepting these allegations as true, the question is not whether Defendants' pickets, in isolation, violated the NLRA. Rather, we ask whether Defendants' overarching scheme of coordinating with the Pilots to blockade the Toledo Port on Defendants' signal falls within the conduct contemplated by Section 8(b)(4)(ii)(B). We conclude that it does because according to Midwest's complaint, the immediate consequence of that plan—cargo ships trapped in the Toledo Port—exerted significant economic pressure on neutral shipping companies with whom the union had no dispute. *Cf. Safeco*, 447 U.S. at 612, 614-15 (noting that unions are responsible for the

"foreseeable consequences" of their actions, especially actions "that reasonably can be expected to threaten neutral parties with ruin or substantial loss"). This is coercion proscribed by Section 8(b)(4)(ii)(B). *See id.* at 612 ("Congress intended to protect secondary parties from pressures that might embroil them in the labor disputes of others[.]"); *see also NLRB v. Fruit & Vegetable Packers & Warehousemen, Loc. 760* (*Tree Fruits*), 377 U.S. 58, 68 (1964) (noting that prohibitions of Section 8(b)(4) were "keyed to the coercive nature of the conduct, whether it be picketing or otherwise").

But this case has an additional twist because Midwest's secondary boycott claim necessarily rests on a theory of derivative liability. In dismissing Midwest's claim, the district court found that "Midwest offer[ed] no basis on which Defendants may be deemed to have undertaken the actions of an unaffiliated third party." R. 92, PID 738-41. Although the complaint does not expressly allege an agency relationship between Defendants and the Pilots, "as a general rule, a plaintiff's complaint need not expressly plead legal theories; it is sufficient to plead factual allegations that can establish a viable theory." *Boshaw v. Midland Brewing Co.*, 32 F.4th 598, 606 (6th Cir. 2022) (citing *Johnson v. City of Shelby*, 574 U.S. 10, 11 (2014)). The Supreme Court has explained that the federal rules require a plaintiff to plead facts sufficient to show his or her claim has substantive plausibility, but "they do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson,* 574 U.S. at 11 (overturning Fifth Circuit precedent requiring plaintiffs to specifically invoke Section 1983 in asserting a Fourteenth Amendment violation). Accordingly, Midwest's complaint need not have labeled the Pilots as Defendants' agents in order to survive a motion to dismiss. It needed only contain "sufficient facts to render it facially plausible that . . . an agency relationship [was] . . . present."

*Franza v. Royal Caribbean Cruises, Ltd.*, 772 F.3d 1225, 1236 (11th Cir. 2014) (quoting *Bamert v. Pulte Home Corp.*, 445 F. App'x 256, 265 (11th Cir. 2011)).

Construing the complaint in the light most favorable to Midwest, the complaint plausibly alleges that Defendants were "responsible for" the Pilots' refusal to navigate the ships in or out of the port, such that they are liable for that conduct under Section 8(b)(4)(ii)(B). *See* 29 U.S.C. § 152(13); *see also Int'l Longshoremen's Ass'n, AFL-CIO v. NLRB*, 56 F.3d 205, 212 (D.C. Cir. 1995) (explaining that this provision of the NLRA was designed to render employers and labor organizations responsible for the acts of their agents). In the NLRA context, we analyze the question of agency "within the framework of common law agency principles," but these principles are "not to be rigidly applied." *Kitchen Fresh, Inc. v. NLRB*, 716 F.2d 351, 355 (6th Cir. 1983) (internal citations omitted); *see also Loc. 1814, Int'l Longshoremen's Ass'n, AFL-CIO v. NLRB*, 735 F.2d 1384, 1394 (D.C. Cir. 1984) (explaining that "agency principles must be expansively construed" in the context of the NLRA). That is because "[t]ransplantation of ordinary agency law, which arises out of ordinary contract and tort disputes, into the NLRA context necessarily requires sensitivity to the particular circumstances of industrial labor relations." *Loc. 1814*, 735 F.2d at 1394; *see also NLRB v. Ken. Tenn. Clay Co.*, 295 F.3d 436, 442 (4th Cir. 2002) ("The question is not so much one of agency, in its purest sense as it is of whether the Union should be held accountable for the employee's conduct. . . . [T]he final inquiry is always whether the amount of association between the Union and the [alleged agent] is significant enough to justify charging the Union with the conduct." (internal quotation marks omitted)).

We have held, in the context of determining union responsibility for the conduct of an employee, that an agency relationship is established in the NLRA context if the union "instigated, authorized, solicited, ratified, condoned or adopted" the actions or statements at issue. *Kitchen*

*Fresh, Inc.*, 716 F.2d at 355 (quoting *NLRB v. Miramar of California*, 601 F.2d 422, 425 (9th Cir. 1979)). Here, the complaint alleges that Defendants—through Yockey—solicited the Pilots' actions by approaching them and forming an agreement to "coordinate" efforts and "stop providing shipping services to the neutral shipping companies" on Defendants' request. R. 64, PID 486. The agreement was purportedly "at the control and direction of the Defendants." *Id.*

Further, Yockey allegedly instigated and organized the Pilots' refusal to navigate ships by strategically establishing "fake" pickets and contacting the Pilots over radio. The complaint alleges that the Pilots refused to navigate ships only when requested to do so by Defendants via the fake picketing, never on their own initiative. It further alleges that Defendants were in direct contact with the LPA and its Pilots during the picketing. On at least one occasion, Yockey approached incoming ships on his pontoon boat and "contacted [them] via radio and talked to the Pilots about the water picket to ensure the Pilots refused to cross the water picket and abide[d] by their agreement." R. 64, PID 489, 493. Other courts have held that comparable planning and control can form the basis for an agency relationship.[11] *Cf. NLRB v. Omaha Bldg. & Const. Trades Council*, 856 F.2d 47, 50–51 (8th Cir. 1988) (finding that a trade council was "responsible for, and thereby engaged in," unlawful picketing—even though "no Council officers or delegates actually carried [the contested] signs at the rallies"—because the Council "planned, organized, publicized, set in motion, and monitored" the rallies).

---

[11] Defendants point to *Int'l Longshoremen's Ass'n, AFL-CIO v. NLRB*, 56 F.3d 205 (D.C. Cir. 1995) for support. That case, while involving similar legal theories of agency, is inapt because it was decided under a different standard. The circuit court there considered the case on review from an NLRB order, rather than at the initial pleading stage. It held that the NLRB erred in finding an agency relationship because the "undisputed facts" of the case, as stipulated by both parties, proved that the American union "exercised no control over the conduct of the Japanese unions." *Id.* at 211, 213. Here, we are bound to take the complaint's allegations as true. And taken as true, the complaint plausibly alleges an agency relationship. Whether the evidence, in fact, supports such a finding remains a question for a later stage of the proceedings.

Further, Yockey allegedly ratified and adopted the Pilots' conduct on April 27, 2017, when he attended a meeting with the Port Authority and took responsibility for the blockade by "admit[ing] that *ILA Local 1982* had blocked the ships at the Midwest Port, [and] that his goal was to have these neutral shipping companies abandon the cargo at Midwest." R. 64, PID 489 (emphasis added). At this same meeting, Yockey allegedly "threatened Midwest and the Port Authority that the Defendants would engage in *additional coordinated actions* with the LPA Pilots to stop future ships." *Id.* at PID 490 (emphasis added). Such a claim—that Yockey both took responsibility for the Pilots' actions and threatened future consequences should Midwest fail to comply—plausibly alleges agency through instigation and ratification. *Cf. Dist. 30, United Mine Workers of Am. v. NLRB*, 819 F.2d 651, 656 (6th Cir. 1987) (rejecting a union's argument that picketers were not agents of the union, and instead holding the union liable for the picket, when the union president made "veiled threats that the entire [mining] hollow would be shut down and that nobody would run any coal unless [an employer] signed the contract and put the [miners] back to work," as these statements "easily could be interpreted as condoning and ratifying the picketers' actions and thus render [the union] liable for those actions"); *Omaha Bldg. & Const. Trades Council*, 856 F.2d at 51 (rejecting a trade council's argument that none of its agents or delegates engaged in problematic picketing, in part because "[l]ater letters from [the president of the council] thanked the participants for their support, demonstrating that the Council condoned the picketers' action").

Within the NLRA context, these allegations of instigation, solicitation, and ratification render it facially plausible that an agency relationship existed between Defendants and the Pilots.[12]

---

[12] Defendants argue that Midwest waived any theory of agency because it failed to expressly make that argument in its response to Defendants' motions to dismiss. Midwest concedes that it did not "explicitly label its

And because Midwest pleaded the factual grounds for its NLRA claim with the requisite specificity, its failure to identify the precise legal theory on which it relied—an agency relationship between Defendants and the Pilots—is not, by itself, basis for dismissal. *See Johnson*, 574 U.S. at 11.

Defendants' arguments to the contrary are unpersuasive. First, they reiterate that the Pilots voluntarily agreed to refuse navigating the neutral ships upon sight of a picket, and therefore Defendants did not coerce them within the meaning of the NLRA. But again, Midwest's main charge is that the pre-arranged coordination with the Pilots coerced the neutral shipping companies into avoiding the Toledo Port. So rather than focusing on the lawfulness of Defendants' interaction with the Pilots, we examine the effect of Defendants' alleged conduct on the neutral shipping companies. *See Laborers Dist. Council of Minn. & N.D. v. NLRB*, 688 F.3d 374, 379–80 (8th Cir. 2012) (noting that the "critical inquiry" in a Section 8(b)(4)(ii)(B) case is "the effect [of the alleged conduct] on the secondary employer, not the lawfulness of the underlying action").

Relatedly, Defendants frame their conduct as merely appealing to the Pilots for support, which is not barred by the NLRA. The dissent too characterizes Defendants' actions as using mere persuasion to enlist the Pilots in their boycott of Midwest. And indeed, we agree that a union may lawfully seek support from the public in its dispute against its *primary* employer. 29 U.S.C.

---

argument an agency argument" below but claims to have raised the "substance" of its agency theory in response to the motion to dismiss. Reply Br. at 28.

Midwest is correct that the crux of Count II has always been that Defendants should be held responsible for stopping the navigation of the cargo ships, and that they acted with the objective of forcing neutral shipping companies to stop doing business with Midwest. And in its opposition to the motion to dismiss, Midwest cited those paragraphs of the complaint alleging that Yockey (1) publicly took credit for the Pilots' blockade, and (2) boasted before the Port Authority that *Defendants* would continue blocking ships with the goal of forcing the cargo companies to cut ties with Midwest. Midwest contended at the time that such conduct constituted inducement, encouragement, threats, and coercion of the neutral shipping companies, and it urged the district court to deny dismissal of Count II on this basis. Though Midwest did not invoke the term "agent" when making this argument below, it is, in essence, the agency by instigation and ratification theory that Midwest now argues on appeal. We therefore decline to find the agency argument waived.

§ 158(b)(4) (providing that "nothing contained in [Section 8(b)(4)(ii)(B)] shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing"). But here, Midwest asserts that Defendants' goal in coordinating with the Pilots was to target the shipping companies, purposefully disrupting the operations of a neutral with whom the union had no dispute.[13] Such conduct, if true, falls within the bounds of Section 8(b)(4)(ii)(B). *Cf. Taylor Milk Co. v. Int'l Bhd. of Teamsters, AFL-CIO*, 248 F.3d 239, 245 (3d Cir. 2001) (rejecting the argument that a union acted within its rights not to renegotiate with a neutral party—and thus there could be no unlawful activity—because courts "look to the intention of the parties in coercing neutral parties, not to the general rights of parties to take particular actions").

Along these lines, Defendants also argue that (1) they have a right to engage in primary picketing around Midwest's docks, and (2) the Pilots have a clause within their contracts allowing them to refuse to navigate any further in the presence of a labor dispute, therefore nothing that occurred was unlawful. But both points are, again, irrelevant because the core of Midwest's complaint is that Defendants colluded with the Pilots *beforehand*, with the deliberate goal of forcing neutral shipping companies to cease doing business with Midwest by disrupting their operations. It is well established that conduct that is otherwise lawful may nonetheless be "coercive" if aimed at unlawful ends. As the Eighth Circuit explained:

> The NLRA's secondary boycott provisions do not require that the coercive conduct itself be unlawful. "Indeed, courts have routinely held that the otherwise legal exercise of rights afforded by a collective bargaining agreement can become unlawful when aimed at securing an objective prohibited by section 8(b)(4)." *380 Brown & Root, Inc. v. La. State AFL-CIO*, 10 F.3d 316, 323–24 (5th Cir. 1994) (collecting cases). "[A]n improper motive may make unlawful what is otherwise unassailable conduct." *Limbach Co. v. Sheet Metal Workers Int'l Ass'n*, 949 F.2d 1241, 1255 (3d Cir. 1991) (en banc). . . . Therefore, the Board and reviewing courts "look to the intention of parties in coercing neutral parties, not to the general rights

---

[13] Yockey himself allegedly told the Port Authority that his goal was to affect the neutral shipping companies, forcing them to "abandon the cargo at Midwest." R. 64, PID 489.

of parties to take particular actions." *Taylor Milk Co. v. Int'l Bhd. of Teamsters*, 248 F.3d 239, 245 (3d Cir. [2001])[.] For example, lawful union actions such as striking and picketing, filing grievances, withholding discretionary concessions, and peaceful group shopping have all been condemned as violating [Section] 8(b)(4) when employed for the purpose of putting coercive economic pressure on a neutral employer to further the union's proscribed secondary objective.

. . .

The Union strives to pose a question of law, arguing that choosing not to enter into a contract cannot be unlawful coercion within the meaning of [Section] 8(b)(4)(ii)(B) because [Section] 8(f) agreements are wholly voluntary. But it is the effect on the secondary employer, not the lawfulness of the underlying action, that is the critical inquiry. The Board has long defined "coercion" to include "economic retaliation or pressure in a background of a labor dispute[.]"

*Laborers Dist. Council of Minn. & N.D.*, 688 F.3d at 379–80. If, as alleged, the legal solicitation of and coordination with the Pilots was geared toward an illegal end—i.e., economically pressuring neutral shipping companies into cutting ties with Midwest—such conduct plausibly falls within Section 8(b)(4)(ii).

Finally, Defendants appeal to a line of Supreme Court cases holding that union members may appeal directly to secondary employers and their managers and convince them to support the boycott. These cases are inapposite. Defendants are correct that in *Loc. 1976, United Bhd. of Carpenters & Joiners of Am., AFL v. NLRB* (*Carpenters*), the Supreme Court held:

A boycott voluntarily engaged in by a secondary employer for his own business reasons, perhaps because the unionization of other employers will protect his competitive position or because he identifies his own interests with those of his employees and their union, is not covered by the statute. Likewise, a union is free to approach an employer to persuade him to engage in a boycott, so long as it refrains from the specifically prohibited means of coercion through inducement of employees.

357 U.S. 93, 98-99 (1958). And Defendants correctly summarize *NLRB v. Servette, Inc.*, which held that a union did not violate the NLRA by asking managers of neutral supermarkets to stop

selling merchandise from their employer, a wholesaler, because this was simply appealing to the managers to make a decision within their authority.[14]  377 U.S. 46, 51 (1964).

But here, according to the complaint, the union did not appeal to the neutral shipping companies themselves for help.  Nor did it appeal to any managers within the shipping companies, who may have had discretion in choosing which ports to use.  Instead, taking the allegations as true, Defendants appealed to independent contractors hired by the neutral companies to perform a non-discretionary task:  navigating the ships into and out of designated ports.  Defendants asked the Pilots to cease this non-discretionary task, and the Pilots complied.  The neutral shipping companies had no say in this matter and did not "voluntarily" engage in a boycott of Midwest. *Carpenter* is therefore inapt.

Further, in both *Carpenters* and *Servette*, the union members did not disrupt operations of the neutral secondary party in making their request; both neutral employers continued to run as usual.  Here, Midwest alleged that Defendants and the Pilots completely shut down the international shipping companies' operations at Midwest whenever a picket occurred.  The only way for these neutral companies to regain normal operations was to sever ties with Midwest and utilize other ports.  This is the sort of economic coercion that Section 8(b)(4)(ii)(B) set out to prohibit. Defendants' arguments are therefore unavailing.

In sum, Midwest plausibly states a claim under Section 303 based on a violation of Section 8(b)(4)(ii)(B) by alleging that Defendants, through their agents the Pilots, deliberately trapped

---

[14] Perhaps the argument could be made that the Pilots' decisions to decline to move ships in and out of ports is a similar discretionary decision that is within their authority to make as independent contractors.  But in *Servette*, the Court noted that the union was not asking managers "to cease performing their managerial duties in order to force their employers to cease doing business with Servette." *Servette*, 377 U.S. at 51.  Such conduct, rather than declining to carry one product line, presumably would have violated Section 8(b)(4)(ii) of the NLRA.  *See id.*

cargo ships around Midwest's port with the object of forcing neutral shipping companies to sever ties with Midwest.

## IV.

For the reasons set out above, we reverse the district court's dismissal of Count II as it relates to allegations that Defendants violated Section 8(b)(4)(ii)(B), and remand for further proceedings on that claim only.

KETHLEDGE, Circuit Judge, dissenting. "A union is free to approach an employer to persuade him to engage in a boycott, so long as it refrains from the specifically prohibited means of coercion[.]" *Local 1976, United Bhd. of Carpenters & Joiners of Am. A.F.L. v. N.L.R.B.*, 357 U.S. 93, 99 (1958). Here, the allegations show only that Local 1982 successfully persuaded neutral pilots to boycott Midwest. That persuasion was lawful, so Midwest failed to state a claim.

The National Labor Relations Act "describes and condemns specific union conduct directed to specific objectives." *Id.* at 98; *Allied Mech. Serv's v. Local 337 of United Ass'n of Journeymen & Apprentices of Plumbing & Pipefitting Indus.*, 221 F.3d 1333 (6th Cir. 2000). Under § 158(b)(4)(i), unions may not "induce or encourage" the employees of a neutral employer to strike for the purpose of pressuring that employer to join the union's labor dispute. *Local 1976*, 357 U.S. at 98. And under § 158(b)(4)(ii), unions may not "threaten, coerce, or restrain" any person for that purpose. But aside from these prohibited tactics, the Act "left a striking labor organization free to use persuasion, not only on the primary employer and his employees but on numerous others," including "secondary employers who were customers or suppliers of the primary employer and persons dealing with them." *Local 761, Int'l Union of Elec., Radio & Mach Workers, AFL-NLRB*, 366 U.S. 667, 672 (1961).

Local 1982 admits that it tried to convince neutral employers to join its labor dispute with Midwest. Specifically, it convinced the pilots to decline assignments where they would navigate international vessels to Midwest's terminals. The pilots themselves are free to accept or decline assignments as they please; thus, the only question is whether Local 1982 threatened or coerced them. *Local 1976*, 357 U.S. at 99. And Midwest itself concedes that Local 1982 "did not threaten, coerce, or restrain the pilots," *Reply* at 5. Midwest can therefore prevail in this suit only by showing that Local 1982 threatened, coerced, or restrained the international shipping companies.

But Midwest has not even alleged any interactions between Local 1982 and those companies. I therefore agree with the district court that Midwest failed to plead any conduct the Act prohibits.

Midwest argues that Local 1982 effectively "restrained" the neutral shipping companies because vessels for those companies could not reach Midwest without the help of a pilot. Thus, Midwest says, Local 1982's appeal to the pilots foreseeably caused a blockade of the port—and unions are "responsible for the foreseeable consequences of their conduct." *Kitchen Fresh, Inc. v. NLRB*, 716 F.2d 351, 354 (6th Cir. 1983). But the Supreme Court has held that unions are responsible for the consequences of a secondary boycott only when they trigger the boycott by prohibited means:

> The primary employer, with whom the union is principally at odds, has no absolute assurance that he will be free from the consequences of a secondary boycott. Nor have other employers or persons who deal with either the primary employer or the secondary employer and who may be injuriously affected by the restrictions on commerce that flow from secondary boycotts. Nor has the general public. […] Congress has not seen fit to protect these other persons or the general public by any wholesale condemnation of secondary boycotts, since *if the secondary employer agrees to the boycott*, or it is brought about by means other than those proscribed in [the statute], *there is no unfair labor practice*.

*Local 1976*, 357 U.S. at 99 (emphasis added). That Local 1982 ultimately prevented the neutral shipping companies from doing business with Midwest is therefore not enough for Midwest to state a claim under the Act. 29 U.S.C. § 158(b)(4)(ii). Rather, Midwest must also allege that Local 1982 obtained that result by means of threats, coercion, or restraint. And Midwest has not made any such allegation.

The majority emphasizes that even otherwise-legal practices (like persuading the pilots) amount to coercion under the Act if those practices coerce a secondary employer (here, the neutral shipping companies). Maj. op. at 15. But that argument conflates the means used to obtain a boycott with the boycott's effects. The Act does not prohibit secondary boycotts that in turn have

some coercive effect; that is typically their point. Rather, the Act prohibits the use of coercive means to obtain a secondary boycott. *Local 1976*, 357 U.S. at 98-99. As the Supreme Court has recognized, successful boycotts are inherently coercive—yet unions may "use persuasion" to bring them about. *Local 761,* 366 U.S. at 672.

Nor can one distinguish this case on the ground that Local 1982 asked the pilots "to target the shipping companies." Maj. op. at 16. Even Midwest does not make that argument; the union asked the pilots to boycott Midwest, with only incidental effects (as discussed immediately above) on the shipping companies. And the pilots' work for those shipping companies otherwise continued undisturbed.

Finally, Midwest argues that the pilots were "agents" of Local 1982 on the ground that the union "instigated" them not to navigate vessels to Midwest. *District 30, United Mine Workers of America v. NLRB*, 819 F.2d 651, 655 (6th Cir. 1987). That argument is forfeited because Midwest never raised it below. *See United States v. Ellison*, 462 F.3d 557, 560 (6th Cir. 2006). We therefore should not reverse the district court on that ground.

Nor is the argument consistent with the Supreme Court's caselaw. What Midwest calls "instigation" is no different from the "persuasion" that the Court has thrice held to be permissible. *Local 1976*, 357 U.S. at 99; *Local 761,* 366 U.S. at 672; *Servette*, 377 U.S. at 54.

I respectfully dissent.